953 A.2d 514

Robert C. JUBELIRER, Senator and President Pro Tempore of the Pennsylvania Senate, and John M. Perzel, Representative and Speaker of the Pennsylvania House of Representatives, Appellants

v.

Edward G. RENDELL, Governor of Pennsylvania; Robin L. Wiessmann, State Treasurer of Pennsylvania; Michael J. Masch, Secretary of Budget and Administration of Pennsylvania; Estelle Richman, Secretary of Public Welfare of Pennsylvania; Pennsylvania Department of Public Welfare; Allen D. Biehler, Secretary of Transportation of Pennsylvania; Pennsylvania Department of Transportation; Colonel Jeffrey B. Miller, Commissioner of the Pennsylvania State Police; Pennsylvania State Police, Appellees.

Supreme Court of Pennsylvania.

Argued March 4, 2008.

Decided Aug. 19, 2008.

18

20

Barbara L. Christie, Esq., PA State Police, Harrisburg, for Pennsylvania State Police.

Peter Houghton LeVan, Esq., Mark Alan Aronchick, Esq., Hangley, Aronchick, Segal & Pudlin, P.C., Philadelphia, for Rendell, Ed, et al.

Leonidas Pandeladis, Esq., Harrisburg, for Robin L. Wiessmann.

Deborah Melamut Minkoff, Esq., Cozen O'Connor, Philadelphia, for amicus curiae American Civil Liberties Union of PA.

Claude Joseph Hafner, Esq., Public Consulting Group, Inc., Gladys Marie Brown, Esq., PA Senate, Harrisburg, for amicus curiae Robert J. Mellow.

Lisa Whitcomb Clark, Esq., Bahar Shariati, Esq., Duane Morris, L.L.P., for amicus curiae Family Planning Council, et al.

Reizdan B. Moore, Esq., David Vincent Vitale, Esq., PA House of Representatives, Harrisburg, for amicus curiae H. William DeWeese.

Monica L. Rebuck, Esq., Peter Houghton LeVan, Esq., Hangley, Aronchick, Segal & Pudlin, P.C., Andrew S. Gordon, Esq., Harrisburg, for Department of Transportation.

Allen C. Warshaw, Esq., John A. Kane, Esq., PA Department of Public Welfare, for Department of Public Welfare.

James D. Neilson, Esq., Harrisburg, for Michael J. Masch.

Linda J. Shorey, Esq., John P. Krill, Jr., Esq., George A. Bibikos, Esq., Kirkpatrick & Lockhart, Preston, Gates, Ellis, L.L.P., Harrisburg, for Jubelirer, Robert and Perzel, John.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD and McCAFFERY, JJ.

## OPINION

Chief Justice CASTILLE.

Today we are asked to decide whether Article IV, Section 16 of the Pennsylvania Constitution ("Section 16")[1] permits the Governor, when presented with an appropriation bill, to delete portions of the language defining a specific appropriation without disapproving the funds with which the language is associated. Relying upon this Court's decision in *Commonwealth ex rel. Attorney General v. Barnett*, 199 Pa. 161, 48 A. 976 (1901), the Commonwealth Court held that the Governor does not violate Section 16 by vetoing only the language defining an appropriation. Because we hold that Section 16 does not permit the Governor to disapprove solely of language—as opposed to amounts appropriated—in an appropriation bill, we reverse the Order of the Commonwealth Court to the extent that it upheld the Governor's vetoes of language in Sections 219, 223, and 2010 of the General Appropriation Act of 2005, and we affirm that part of the order that upheld the Governor's veto of language in Section 801 of the Act.

The appropriation bill at issue in this case is the General Appropriation Act of 2005 ("2005 GAA"), Act No. 2005-1-A, which Governor Edward G. Rendell signed into law on July 7, 2005. Upon signing the 2005 GAA, the Governor issued a statement informing the House of Representatives that he had approved the 2005 GAA but with seven exceptions. The first

1. Section 16 provides as follows:

The Governor shall have power to disapprove of any item or items of any bill, making appropriations of money, embracing distinct items, and the part or parts of the bill approved shall be the law, and the item or items of appropriation disapproved shall be void, unless repassed according to the rules and limitations prescribed for the passage of other bills over the Executive veto.

PA. CONST. art. IV, § 16.

three of these seven exceptions were three appropriations that the Governor vetoed in their entirety. With respect to each of these three appropriations, the Governor stated that he was "withhold[ing][his] approval from the following [or 'this'] entire item[.]" Reproduced Record ("R.R.") at 35a, 36a.[2]

The remaining four provisions of the 2005 GAA that the Governor purported to veto (hereinafter, "Challenged Vetoes") are the subject of this appeal. The first Challenged Veto disapproved the entirety of Section 2010 of the 2005 GAA, which was found in Part XX (entitled "Miscellaneous Provisions for 2005–2006"). Section 2010 provided, in its entirety, as follows:

> Section 2010. Motor License Fund limitation.—The Department of Transportation is authorized to make adjustments to construction contracts for highway capital projects involving steel entered into prior to March 1, 2004, where the adjustments are supported by mutual consideration.

R.R. at 301a.

Respecting the other three Challenged Vetoes, the Governor stated that he was withholding his approval from "language in" or "language that appears in" the appropriation made in each section, but he left intact the amount of each appropriation. In particular, the Governor purported to veto:

- from Section 219 (appropriating, *inter alia*, $921,080,000 to the Department of Public Welfare ("DPW") for Medicaid payments for outpatient services) a provision prohibiting DPW from expending funds for family planning services in excess of the amounts expended for such services

2. In particular, the Governor withheld his approval from the following "entire items":
- Section 803 (appropriating $750,000 for initiative "to develop and implement hand held molecular sensing technology to protect port workers from nuclear, biological, chemical and poisonous contamination in the handling of containers and container contents");
- Section 301 (appropriating $3,000,000 for "a senior center grant program"); and
- Section 803 (appropriating $1,000,000 for "the improvement of the public roadways, highways and bridges of the Commonwealth that are also used by snowmobiles and all-terrain vehicles").
R.R. at 35a, 36a.

during the 2004–05 fiscal year and subjecting such funds to the same restrictions contained in the appropriation for grants for women's medical services; [3]

- from Section 223 (appropriating $137,393,000 to the State Police for general operations) a provision requiring a public hearing to be held on thirty days' notice before the closure of any state police barracks; [4] and

3. The exact language that the Governor purported to veto, along with its context within Section 219 of the 2005 GAA, is as follows:

Section 219. Department of Public Welfare.-The following sums are appropriated to the Department of Public Welfare:

\* \* \* \*

For medical assistance payments-outpatient services, exclusive of outpatient services provided through capitation plans. The Department of Public Welfare shall not require a recipient to obtain a physician referral in order to receive chiropractic services. The Department of Public Welfare shall not expend or authorize the expenditure of any funds for family planning services in excess of the amounts expended for such services in the 2004-2005 fiscal year and any such funds which are expended shall be subject to the same restrictions contained in the appropriation for grants for women's medical services.
State appropriation . . . . . . . . $921,080,000
The following Federal amounts are appropriated to supplement the sum appropriated for medical assistance—outpatient:

(1) "Medical Assistance—Outpatient." The Department of Public Welfare shall not require a recipient to obtain a physician referral in order to receive chiropractic services. The Department of Public Welfare shall not expand or authorize the expenditure of any funds for family planning services in excess of the amounts expended for such services in the 2004-2005 fiscal year and any such funds which are expended shall be subject to the same restrictions contained in the appropriation for grants for women's medical services.
Federal appropriation . . . . . . $1,288,555,000

\* \* \* \*

R.R. at 150a–181a (strikethrough added to indicate language Governor purported to veto).

4. The exact language that the Governor purported to veto, along with its context within Section 223 of the 2005 GAA, is as follows:

Section 223. Pennsylvania State Police.—The following amounts are appropriated to the Pennsylvania State Police:

For general government operations of the Pennsylvania State Police. No less than $350,000 of this appropriation shall be for the continuation and expansion of comprehensive and proactive programs coordinating with Federal, State and local law enforcement to remove violent felons, illegal narcotics, illegal weapons and nuisance bars from crime-ridden communities. No Pennsylvania Police State

- from Section 801 (appropriating, *inter alia*, $5,000,000 for salaries, wages, and all necessary expenses for administration and operation of maintenance program for State roads, bridges, tunnels, and structures) a provision requiring the use of at least $1.5 million of appropriated funds for a pilot project to expand the width of pavement markings from four inches to six inches on limited-access highways.[5]

R.R. at 37a–39a.

On September 27, 2005, then-Senator Robert C. Jubelirer (also then-President *Pro Tempore* of the Senate) and Repre-

barracks shall be closed until such time as the Pennsylvania State Police conduct a public hearing and provide 30 days' notice which shall be published in the Pennsylvania Bulletin and in at least two local newspapers.

State appropriation . . . . . . . . $137,393,000

\* \* \* \*

R.R. at 185a–189a (strikethrough added to indicate language Governor purported to veto).

5. The exact language that the Governor purported to veto, along with its context within Section 801 of the 2005 GAA, is as follows:

Section 801. Department of Transportation.—The following amounts are appropriated to the Department of Transportation:

\* \* \* \*

For the salaries, wages and all necessary expenses for the administration and operation of the maintenance program for State roads, bridges, tunnels and structures, including the operation of the county maintenance district facilities. At least $4,000,000 shall be used for the installation and maintenance of raised reflective pavement markers on interstate and similar highways and for installation and maintenance of such markers on other State roads at locations determined by the Department of Transportation. The $4,000,000 may be drawn from both the highway and safety improvement and maintenance appropriations. At least $3,000,000 shall be used for the Crossroads Development Project. The $3,000,000 may be drawn from both the highway and safety improvement and maintenance appropriations. At least $1,500,000 shall be used for a pilot project to expand the width of pavement markings from four inches to six inches on limited access highways. The $1,500,000 may be drawn from both the highway and safety improvement and maintenance appropriations.

State appropriation . . . . . . . $770,500,000

\* \* \* \*

R.R. at 240a–244a (strikethrough added to indicate language Governor purported to veto).

sentative John M. Perzel (then-Speaker of the House) (collectively, "appellants") filed a petition for review in the original jurisdiction of the Commonwealth Court, seeking a declaratory judgment and injunctive relief. Specifically, appellants asked the Commonwealth Court: (1) to declare that Section 16 does not permit the Governor to disapprove of language—as opposed to amounts appropriated—in an appropriation bill; (2) to declare that the Challenged Vetoes were unconstitutional, null, and void; and (3) to enjoin certain members of the Rendell Administration (collectively, "appellees") from complying with the Challenged Vetoes. In addition to Governor Rendell, appellants named the following as respondents in the petition for review: then-Secretary of the Budget and Administration (now Secretary of the Budget) Michael J. Masch; Secretary of Public Welfare Estelle Richman and DPW; Secretary of Transportation Allen D. Biehler and the Department of Transportation; and State Police Commissioner Colonel Jeffrey B. Miller and the State Police.[6] Appellees filed an answer and an application for summary relief on November 10, 2005.

On August 10, 2006, the Commonwealth Court, sitting *en banc,* issued a published opinion and order unanimously granting summary relief to appellees, upholding all four Challenged Vetoes. *Jubelirer v. Rendell,* 904 A.2d 1030 (Pa.Cmwlth.2006). In construing Section 16 as permitting the Governor to disapprove of language in appropriation bills without disapproving of amounts appropriated, the court relied entirely upon this Court's 1901 decision in *Barnett,* quoting the following language from our opinion in that case:

> But every appropriation, though it be for a single purpose, necessarily presents two considerations almost equally material, namely, the subject and the amount. The subject may be approved on its merits, and yet the amount disapproved, as out of the proportion to the requirements of the case, or as beyond the prudent use of the state's income.

6. Appellants also named as a respondent then-State Treasurer Robert P. Casey, Jr., but Treasurer Casey did not join in the application for summary relief and is not a party to the appeal *sub judice.*

The legislature had full control of the appropriation in both its aspects and the plain intent of this section was to give the governor the same control, as to disapproval, over each subject and each amount. A contrary construction would destroy the usefulness of the constitutional provision. If the legislature, by putting purpose, subject, and amount inseparably together, and calling them an "item," can coerce the governor to approve the whole or none, then the old evil is revived which this section was intended to destroy.

*Barnett*, 48 A. at 978. The above language, the Commonwealth Court determined, "unequivocally interprets our Constitution to grant to the Governor the power to disapprove of either the amount of an appropriation or the purpose for which money is appropriated or both." *Jubelirer*, 904 A.2d at 1035. As for appellants' contention that *Barnett's* holding was limited to this Court's conclusion that Section 16 permits the Governor to reduce the amount of an appropriation, the Commonwealth Court simply stated that "[t]he words of the *Barnett* court quoted above clearly contradict this assertion." *Jubelirer*, 904 A.2d at 1035. The court then noted that, while appellants relied on *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991) and *Pap's A.M. v. City of Erie*, 571 Pa. 375, 812 A.2d 591 (2002), these decisions were "of no help" because they "address general rules of constitutional interpretation." *Jubelirer*, 904 A.2d at 1035. The court concluded its brief analysis by noting that Article IV, Section 15 [7] permits the General Assembly to restore appropriations disapproved by the Governor and that "this is not only the appropriate, but

7. Article IV, Section 15 allows the General Assembly to override a governor's veto of legislation as follows:

> Every bill which shall have passed both Houses shall be presented to the Governor; if he approves he shall sign it, but if he shall not approve he shall return it with his objections to the House in which it shall have originated, which House shall enter the objections at large upon their journal, and proceed to reconsider it. If after such reconsideration, two-thirds of all the members elected to that House shall agree to pass the bill, it shall be sent with the objections to the other House by which likewise it shall be re-considered, and if approved by two-thirds of all the members elected to that House it shall be a law. . . .

PA CONST. art. IV, § 15.

also the sole remedy available." *Id.* at 1036.[8] President Judge James Gardner Colins authored the court's opinion, which was joined by four judges, while two judges did not participate in the decision.[9]

Pennsylvania Rule of Appellate Procedure 1532(b) provides as follows:

> **(b) Summary relief.** At any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear.

Pa.R.A.P. 1532(b). "An application for summary relief may be granted if a party's right to judgment is clear and no material issues of fact are in dispute." *Calloway v. Pa. Bd. of Prob. & Parole*, 857 A.2d 218, 220 n. 3 (Pa.Cmwlth.2004); *Adams Elec. Coop., Inc. v. Commonwealth*, 853 A.2d 1162, 1164 n. 1 (Pa. Cmwlth.2004), *aff'd per curiam*, 585 Pa. 3, 887 A.2d 1213 (2005). Where, as here, there is no dispute as to any material issues of fact, the question of whether summary relief was appropriately denied is one of law; therefore, our standard of review is plenary. *Mullin v. Commonwealth*, 582 Pa. 127, 870 A.2d 773, 778 (2005).

Before relating the parties' respective arguments, it is first necessary to resolve a basic disagreement between them as to the proper analytical approach for this case. As they did before the Commonwealth Court, appellants undertake the familiar four-factor analysis for state constitutional

---

**8.** Appellants take issue with this notation in the Commonwealth Court's opinion, contending that the court thereby suggested—erroneously— that "Article IV, § 16 has a built-in 'political exhaustion doctrine' that [appellants] were obliged to pursue before seeking judicial review of the Governor's purported exercise of power under Article IV, § 16." Appellants' Brief at 38. As appellees do not share appellants' interpretation of the court's comment and our decision does not require us to address it, we simply note appellants' concern.

**9.** In its opinion, the Commonwealth Court also disposed of two ancillary matters that are not at issue in appellants' appeal to this Court. The court first overruled appellant Senator Jubelirer's preliminary objections and denied Senator Jubelirer's motion to strike appellees' answer to appellants' petition for review. The court also deemed as moot appellee then-Treasurer Casey's preliminary objection seeking to remove himself as a party.

questions that this Court first set forth in *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887, 895 (1991) (directing litigants to brief and analyze: (1) relevant text of provision of Pennsylvania Constitution; (2) history of provision, including Pennsylvania caselaw; (3) relevant caselaw from other jurisdictions; and (4) policy considerations). In particular, appellants quote our admonition in *Edmunds* that "it is both important and necessary that we undertake an independent analysis of the Pennsylvania Constitution, each time a provision of that fundamental document is implicated." *Id.* at 894–95. Accordingly, appellants dispute the Commonwealth Court's dismissal of their reliance on *Edmunds* and have devoted the bulk of their brief to a subdivided four-part analysis of Section 16.

Appellees, on the other hand, defend the Commonwealth Court's determination that an *Edmunds* analysis is inappropriate in this case. Citing two decisions of the Commonwealth Court, appellees assert that "an *Edmunds* analysis is proper only where the courts in Pennsylvania have yet to address the constitutional provision at issue." Appellees' Brief at 20 (citing *Commonwealth ex rel. Pappert v. Coy*, 860 A.2d 1201 (Pa.Cmwlth.2004); *Dep't of Auditor Gen. v. State Employees' Ret. Sys.*, 836 A.2d 1053 (Pa.Cmwlth.2003)). Appellees contend that, since this Court in *Barnett* already determined the scope of the Governor's item veto power under Section 16, there is no need for this Court to engage in an *Edmunds* analysis.

We agree with the Commonwealth Court that a traditional *Edmunds* analysis would not be helpful in this case, although not for the reason offered by appellees. The question before this Court in *Edmunds* was whether Article I, Section 8 of the Pennsylvania Constitution incorporated a "good faith" exception to the exclusionary rule, as the U.S. Supreme Court had held with respect to the Fourth Amendment of the U.S. Constitution—the federal analogue to Article I, Section 8—in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In setting forth the four-factor test, this Court observed as follows:

This Court has long emphasized that, in interpreting a provision of the Pennsylvania Constitution, we are not bound by the decisions of the United States Supreme Court which interpret similar (yet distinct) federal constitutional provisions.

... [T]he federal constitution establishes certain minimum levels which are equally applicable to the analogous state constitutional provision. However, each state has the power to provide broader standards, and go beyond the minimum floor which is established by the federal Constitution.

* * * *

Here in Pennsylvania, we have stated with increasing frequency that it is both important and necessary that we undertake an independent analysis of the Pennsylvania Constitution, each time a provision of that fundamental document is implicated. Although we may accord weight to federal decisions where they are found to be logically persuasive and well reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees, we are free to reject the conclusions of the United States Supreme Court so long as we remain faithful to the minimum guarantees established by the United States Constitution.

... [W]e find it important to set forth certain factors to be briefed and analyzed by litigants in each case hereafter implicating a provision of the Pennsylvania constitution. The decision of the United States Supreme Court in *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 ... (1983), now requires us to make a "plain statement" of the adequate and independent state grounds upon which we rely, in order to avoid any doubt that we have rested our decision squarely upon Pennsylvania jurisprudence. Accordingly, as a general rule it is important that litigants brief and analyze at least the following four factors[.]

*Edmunds*, 586 A.2d at 894–95 (citations, quotation marks, and footnotes omitted).

The question presented in *Edmunds* involved the possible tension between federal and Pennsylvania constitutional law. Notwithstanding the "each time" language cited by appellants, as the full context of our admonition in *Edmunds* makes clear, we directed litigants to address the four factors in light of the need, when interpreting a provision of the Pennsylvania Constitution invoked to support a departure from federal law, to take into account the text of the corresponding provision of the U.S. Constitution as well as decisions interpreting that provision. In subsequent decisions, we have been precise in explaining that it is when a matter calls for this kind of comparative constitutional analysis that we turn to the four *Edmunds* factors for guidance. *See, e.g., Commonwealth v. Hawkins*, 553 Pa. 76, 718 A.2d 265, 268 (1998) ("When asked to decide whether our state Constitution provides greater privileges and protections than the United States Constitution, we evaluate the request in light of the following factors[.]") (citing *Edmunds* ); *Commonwealth v. Williams*, 547 Pa. 577, 692 A.2d 1031, 1038 (1997) ("When determining whether the Pennsylvania Constitution provides greater protection than its counterpart in the federal constitution, this Court considers the following four factors set forth in [*Edmunds.*]"); *Commonwealth v. Hayes*, 544 Pa. 46, 674 A.2d 677, 680 (1996) ("When resolving a claim for heightened protection under our State Constitution, this Court established in [*Edmunds* ] a four pronged analysis...."); *Commonwealth v. Swinehart*, 541 Pa. 500, 664 A.2d 957, 961 (1995) ("[A]s to the specific claim that the Pennsylvania Constitution provides greater protection than the United States Constitution, this Court stated in [*Edmunds* ] that when reviewing such a claim....").[10] Although this Court is not always so explicit in

10. It is also worth noting that this Court has rendered numerous constitutional decisions in this comparative arena without employing *Edmunds* at all. *See, e.g., Commonwealth v. Shaw*, 564 Pa. 617, 770 A.2d 295 (2001); *Commonwealth v. White*, 543 Pa. 45, 669 A.2d 896 (1995); *Commonwealth v. Mason*, 535 Pa. 560, 637 A.2d 251 (1993). This author has suggested that state constitutional holdings, in the comparative arena, that are unsupported by an *Edmunds* analysis have less secure constitutional footing. *See Shaw*, 770 A.2d at 305 (Castille, J., dissenting).

identifying the exact circumstances that call for an *Edmunds* analysis, the need for such a comparative approach is clear in the cases where we have employed the four factors. *See, e.g., Commonwealth v. Russo,* 594 Pa. 119, 934 A.2d 1199 (2007) (considering applicability of federal Fourth Amendment open fields doctrine under PA. CONST. art. I, § 8); *Pap's A.M. v. City of Erie,* 571 Pa. 375, 812 A.2d 591 (2002) (applicability of First Amendment jurisprudence under PA. CONST. art. I, § 7 with respect to restrictions on expressive conduct); *Commonwealth v. Glass,* 562 Pa. 187, 754 A.2d 655 (2000) (applicability of Fourth Amendment jurisprudence under PA. CONST. art. I, § 8 regarding anticipatory search warrants); *Commonwealth v. Cleckley,* 558 Pa. 517, 738 A.2d 427 (1999) (same with respect to voluntariness of consent to warrantless searches); *Commonwealth v. Matos,* 543 Pa. 449, 672 A.2d 769 (1996) (same with respect to whether pursuit by police constitutes seizure); *United Artists' Theater Circuit, Inc. v. City of Philadelphia,* 535 Pa. 370, 635 A.2d 612 (1993) (applicability of Fifth Amendment jurisprudence under PA. CONST. art. I, § 10 regarding historic designation of private property without owners' consent); *Blum by Blum v. Merrell Dow Pharms., Inc.,* 534 Pa. 97, 626 A.2d 537 (1993) (applicability of Sixth Amendment jurisprudence under PA. CONST. art. I, § 6 with respect to requirement of twelve-person jury).

In contrast, this Court is sometimes presented with cases requiring us to interpret a provision of the Pennsylvania Constitution that lacks a counterpart in the U.S. Constitution. In such cases, because there is no federal constitutional text or federal caselaw to consider, we have not engaged in the four-factor analysis set forth in *Edmunds. See, e.g., Commonwealth ex rel. Corbett v. Griffin,* 946 A.2d 668 (2008) (concerning meaning of "infamous crimes" under PA. CONST. art. II, § 7, which prohibits anyone convicted of such offense from holding office of trust or profit in Commonwealth); *Downingtown Area Sch. Dist. v. Chester County Bd. of Assessment Appeals,* 590 Pa. 459, 913 A.2d 194 (2006) (concerning whether prevailing statutory scheme for tax equalization obviates common law procedure for asserting challenge under PA. CONST.

art. VIII, § 1 (Uniformity Clause)); *Grimaud v. Commonwealth*, 581 Pa. 398, 865 A.2d 835 (2005) (interpreting requirement of PA. CONST. art. XI, § 1 that "[w]hen two or more amendments shall be submitted they shall be voted upon separately"); *City of Philadelphia v. Commonwealth*, 575 Pa. 542, 838 A.2d 566 (2003) (interpreting prohibition of PA. CONST. art. III, § 3 on passage of any bill "containing more than one subject"); *Pa. AFL–CIO ex rel. George v. Commonwealth*, 563 Pa. 108, 757 A.2d 917 (2000) (concerning whether PA. CONST. art. III, § 5 prohibits chamber of General Assembly in which bill originates from further amending bill returned to it by other chamber with amendments); *In re Prendergast*, 543 Pa. 498, 673 A.2d 324 (1996) (construing qualifications for state representative as set forth in PA. CONST. art. II, § 5); *Glancey v. State Employes' Ret. Bd.*, 530 Pa. 481, 610 A.2d 15 (1992) (concerning whether judges removed from office for disciplinary reasons automatically forfeit their pension benefits by virtue of PA. CONST. art. V, § 16(b)).

 Because there is no counterpart to Section 16 in the U.S. Constitution [11]—and thus there is no comparative consti-

11. Interestingly, it was not any state constitution that first provided for an item veto; rather, it was the Constitution of the Confederate States of America. Richard Briffault, *Emerging Issues in State Constitutional Law*, 66 TEMP L.REV 1171, 1176 n. 19 (1993).

Recent Presidents have consistently called for some form of item veto of congressional appropriations. In 1996, Congress obliged President Clinton, enacting the Line Item Veto Act, 2 U.S.C. § 691 *et seq.* The Act gave the President the power to "cancel in whole" three types of provisions that already had been signed into law: "(1) any dollar amount of discretionary budget authority; (2) any item of new direct spending; or (3) any limited tax benefit." 2 U.S.C. § 691(a). However, in *Clinton v. New York*, 524 U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998), the U.S. Supreme Court invalidated the Act, holding that it violated the Presentment Clause, U.S. CONST. art. I, § 7, cl. 2 ("Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall ... proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law....").

tutional argument forwarded—the instant case falls into that category of constitutional cases that does not lend itself well to the traditional *Edmunds* analysis. Therefore, we will present the arguments advanced by appellants outside the context of the four *Edmunds* factors in which they are set forth in appellants' brief.[12]

Appellants argue that the power granted to the Governor in Section 16 to "disapprove of any item or items" of an appropriation bill is directed to the disapproval of all or part of the amount of any appropriation. Just as Section 16 does not allow the Governor to create or increase an appropriation, appellants contend, the provision does not permit the Governor to disapprove of language in an appropriation bill because this would have the same practical effect as creating or increasing an appropriation. By way of example, appellants submit that, if the Governor could veto language requiring $0.1 million of a $1.1 million general appropriation to an agency to be used for a particular project, the Governor would effectively increase the appropriation to the agency for its general operations.

Instead, appellants argue, the Governor's power under Section 16 is a power of negation—*i.e.*, he may only negate (or disapprove) an appropriation, either entirely or partially by reducing its amount. In support of their view of the Governor's Section 16 power, appellants cite this Court's language in *Barnett*, where we noted the power's "limited sphere of negation" and that the power "is limited to negation or concurrence." *Barnett*, 48 A. at 976. Appellants, on the other hand, contend that discussions in *Barnett* concerning the Governor's power to disapprove "items" or "parts" other than an amount in an appropriation bill are *dicta* and therefore of no precedential value. Acknowledging that there was no discussion of

12. This is not to say that certain *Edmunds* factors would not be helpful. In construing a constitutional provision, as when construing a statute, this Court begins with the plain language. Further, parties obviously should argue existing decisional law under the provision, and where relevant, policy considerations. Finally, to the extent other states have identical or similar provisions, extrajurisdictional caselaw may be helpful and persuasive.

Section 16 at the Constitutional Convention of 1873 when the provision was proposed, appellants cite portions of debates at subsequent conventions in support of their interpretation. According to appellants, the traditional understanding of Section 16 is that it serves the purpose of providing the Governor with the ability to reduce amounts appropriated in order to satisfy the constitutional requirement of a balanced budget. *See* PA. CONST. art. VIII, § 13(a).

Appellants append to their brief a review of decisions from twenty-six other jurisdictions construing constitutional provisions that, like Article IV, Section 16 of our Constitution, grant a governor the power to partially disapprove of appropriation bills. In the body of their brief, appellants focus on decisions from six of these jurisdictions—namely, Alaska, Connecticut, Idaho, Mississippi, New Mexico, and South Carolina—where the Governor's partial disapproval power is considered to be "one of negation rather than of creation." Appellants' Brief at 23.

Appellees dispute appellants' contention that the Governor's Section 16 item veto power is limited to the amount of an appropriation. Rather, appellees argue, *Barnett* stands for the proposition that "a governor has the right to independently assess and disapprove the subject, the amount, and the purpose of any appropriation." Appellees' Brief at 10. Indeed, appellees contend, "the scope of a governor's disapproval power is **entirely coextensive** with the General Assembly's right to include language in an appropriation bill." *Id.* In other words, according to appellees, if the General Assembly can enact language in an appropriation bill, the Governor has the constitutional authority to eliminate the language. In appellees' view, conditional language is no exception: if the General Assembly puts in a condition restricting the use of a specific appropriation, that condition qualifies as an "item" within the meaning of Section 16 and is therefore, under *Barnett,* fully subject to the Governor's disapproval power. Appellees reject appellants' contention that the *Barnett* Court's discussion of the scope of the Governor's disapproval power is *dicta.* According to appellees, the *Barnett* Court

could not have determined whether the Governor had the constitutional authority to reduce the amount of an appropriation without first determining the scope of the executive disapproval power granted by Section 16.

Appellees do not dispute appellants' characterization of the Governor's Section 16 item veto power as essentially negative in nature. Appellees, however, take issue with appellants' contention that the Challenged Vetoes resulted in the creation of new legislation. Engaging appellants' hypothetical of a $1.1 million general appropriation with a $0.1 million specific appropriation vetoed by the Governor, appellees argue that a governor's disapproval of the specific appropriation is no more "creative" in effect than a governor's reduction of an appropriation. Such a veto, appellees explain, does not free up the $0.1 million for any purpose of that governor's choosing; rather, the $0.1 million simply reverts to the agency's general appropriation, which the General Assembly made. As for appellants' argument that a governor's exercise of his disapproval power in this fashion contravenes legislative intent in some sense, appellees dismiss this notion as a red herring, contending that Section 16 is designed to act as a check against legislative power rather than as a vehicle to advance legislative intent.

Additionally, appellees note that, for more than two decades, Pennsylvania governors from both major political parties have disapproved of provisions in appropriation bills similar to the Challenged Vetoes of the instant case. Appellees cite three specific instances of a governor's disapproval of provisions of appropriation bills substantially similar to those that Governor Rendell purported to veto here: Republican Governor Richard L. Thornburgh's disapproval of 51 provisions of the 1983 general appropriation bill, Democratic Governor Robert P. Casey's disapproval of four provisions of the 1988 general appropriation bill, and Republican Governor Thomas J. Ridge's disapproval of a single provision of the 1995 general appropriation bill. Appellees note that, in none of these instances—nor in two previous instances under the current administration—did a member of the General Assembly file a

legal challenge against the Governor's exercise of his item veto power.

As for the decisions from the six sister jurisdictions upon which appellants rely to support their understanding of the scope of the Governor's Section 16 item veto power, appellees contend that it is unnecessary to turn to these decisions for guidance because this Court's decision in *Barnett* controls the outcome of the case *sub judice.* Moreover, appellees argue, it would be inappropriate to follow the six extrajurisdictional decisions because they are premised upon a different, far narrower understanding of the word "item"—*i.e.,* a discrete sum of money—as it appears in other states' counterparts to Section 16 rather than the broad interpretation clearly set forth in *Barnett*—*i.e.,* "the particulars, the details, [and] the distinct and severable parts of [an] appropriation," *Barnett,* 48 A. at 977. In any event, appellees note that a broad definition of the scope of the Governor's item veto power is not unique to Pennsylvania. Appellees cite decisions of the supreme courts of New Jersey, Wisconsin, and West Virginia as holding that a governor may strike any portion of an appropriation bill and enact the remaining provisions.

Finally, appellees warn that, if this Court were to hold that the Governor's Section 16 item veto power is limited to the amount of an appropriation, we would thereby effectively revive the old practice of "logrolling," the very legislative evil that Section 16 was designed to abolish. Appellees' Brief at 24 (citing *Hosp. & Healthsystem Ass'n v. Dep't of Pub. Welfare,* 585 Pa. 106, 888 A.2d 601 (2005)). The General Assembly, appellees fear, "could once again 'load up' large appropriations with objectionable conditions and put the governor to [a] Hobbesian choice." *Id.* Namely, the Governor would be forced either: (1) to approve the appropriation with the condition to which he objects; or (2) to disapprove the entire appropriation, perhaps resulting in the elimination of one or more important public programs, even though only a small portion of the appropriation was objectionable.[13]

13. Appellees devote the last part of their brief to their contention that three of the four provisions of the 2005 GAA that Governor Rendell

In a reply brief, appellants take issue with appellees' reliance on the past practice of Pennsylvania governors in exercising their item veto power under Section 16. Citing *School Districts of Deer Lakes & Allegheny Valley v. Kane*, 463 Pa. 554, 345 A.2d 658 (1975), appellants emphasize that, even when established, such past executive practice does not bind the judiciary in exercising its unique role of interpreting the Constitution. In any event, appellants contend, there is no consistent past practice here that favors appellees' interpretation. In the 128 years since Section 16 was adopted, appellants observe, only seven governors disapproved of mere language in an appropriation bill, and only one of the seven did so between 1901 (when *Barnett* was decided) and 1977.

Appellants also respond to appellees' argument that reversing the Commonwealth Court would revive the legislative evil of logrolling. Appellants deny that Section 16 was designed to abolish logrolling, arguing that it is Article III, Section 3 (requiring that a bill be limited to a single subject) that was aimed at putting an end to that practice. According to

purported to veto—those found in Sections 219, 223, and 2010—would have been null and void even had the Governor not vetoed them because they violate Article III, Section 11 of the Pennsylvania Constitution (providing that a general appropriation bill "shall embrace nothing but appropriations for the executive, legislative, and judicial departments of the Commonwealth, for the public debt and for public schools"). This argument is also the essence of an *amicus curiae* brief filed by State Senator Robert J. Mellow, the Democratic Leader of the Pennsylvania Senate.

Even assuming appellees are correct that Sections 219, 223, and 2010 of the 2005 GAA violate Article III, Section 11, the Challenged Vetoes could not be upheld on this basis. Under appellees' logic, if the Governor could subsequently prove that an appropriation bill would be unconstitutional in the absence of various provisions that the General Assembly failed to include, the Governor would be empowered to add those provisions himself, even though he obviously lacks the constitutional authority to do so.

The constitutionality of Sections 219, 223, and 2010 of the 2005 GAA—under any provision of our Constitution—is not before us in this case. Instead, we are asked to decide the constitutionality of the Governor's disapproval of Section 2010 and of portions of Sections 219 and 223 (along with Section 801). Therefore, appellees' reliance on Article III, Section 11 as showing the Governor's good reasons for the Challenged Vetoes does not answer the question of constitutional interpretation posed.

appellants, in light of the compromises that are necessary to attain majorities in each house in order to enact a budget, Article III, Section 3 applies to every bill "except a general appropriation bill," PA. CONST. art. III, § 3.

Where, as here, an issue requires this Court to construe a provision of our Constitution, "[o]ur ultimate touchstone is the actual language of the Constitution itself." *Stilp v. Commonwealth*, 588 Pa. 539, 905 A.2d 918, 939 (2006) (citing *Firing v. Kephart*, 466 Pa. 560, 353 A.2d 833, 835–36 (1976)). The language of the Constitution "must be interpreted in its popular sense, as understood by the people when they voted on its adoption." *Id.* (quoting *Ieropoli v. AC & S Corp.*, 577 Pa. 138, 842 A.2d 919, 925 (2004)); *Berardocco v. Colden*, 469 Pa. 452, 366 A.2d 574, 577 (1976); *Firing*, 353 A.2d at 835. In seeking the "ordinary, natural interpretation the ratifying voter would give" to provisions of the Constitution, we avoid reading them "in a strained or technical manner." *Commonwealth ex rel. Paulinski v. Isaac*, 483 Pa. 467, 397 A.2d 760, 765 (1979).

Although the constitutional language is always our interpretive focus, we bear in mind that "because the Constitution is an integrated whole, effect must be given to all of its provisions whenever possible." *Cavanaugh v. Davis*, 497 Pa. 351, 440 A.2d 1380, 1382 (1982); *accord In re Larsen*, 571 Pa. 457, 812 A.2d 640, 649 (2002). Thus, where two provisions of our Constitution relate to the same subject matter, they are to be read *in pari materia, Cavanaugh*, 440 A.2d at 1381; *Berardocco*, 366 A.2d at 577; *Commonwealth ex rel. Specter v. Vignola*, 446 Pa. 1, 285 A.2d 869, 872 (1971); *Larsen*, 812 A.2d at 649, and the meaning of a particular word cannot be understood outside the context of the section in which it is used, *Long v. Sch. Dist. of Cheltenham Twp.*, 269 Pa. 472, 112 A. 545, 546 (1921). "[W]hen there is any overlapping or any apparent ambiguity or real conflict or inconsistency, the specific must prevail over the general." *Vignola*, 285 A.2d at 872; *accord Larsen*, 812 A.2d at 649.

Instantly, the parties agree that the 2005 GAA is an appropriation bill and that, therefore, the applicable provision of our Constitution is Section 16. Nevertheless, because Article IV, Section 15 provides the context necessary to understand the meaning of Section 16, we set forth, in pertinent part, both provisions below:

### § 15. Approval of bills; vetoes

Every bill which shall have passed both Houses shall be presented to the Governor; if he approves he shall sign it, but if he shall not approve he shall return it with his objections to the House in which it shall have originated, which House shall enter the objections at large upon their journal, and proceed to reconsider it. If after such reconsideration, two-thirds of all the members elected to that House shall agree to pass the bill, it shall be sent with the objections to the other House by which likewise it shall be re-considered, and if approved by two-thirds of all the members elected to that House it shall be a law. . . .

### § 16. Partial disapproval of appropriation bills

The Governor shall have power to disapprove of any item or items of any bill, making appropriations of money, embracing distinct items, and the part or parts of the bill approved shall be the law, and the item or items of appropriation disapproved shall be void, unless re-passed according to the rules and limitations prescribed for the passage of other bills over the Executive veto.

PA. CONST. art. IV, §§ 15, 16. Given the parties' agreement that the 2005 GAA is an appropriation bill—which it obviously is—their dispute boils down to the meaning of "item" for purposes of Section 16—*i.e.*, that of which the Governor may disapprove.

"One of the distinct and enduring qualities of our system of government is its foundation upon separated powers." *Commonwealth v. Mockaitis*, 575 Pa. 5, 834 A.2d 488, 499 (2003). The separation of powers into the legislative, executive, and judicial branches first appeared in Pennsylvania in the original constitution of 1776 prepared by the convention

in that year. *In re Investigation by Dauphin County Grand Jury*, 332 Pa. 342, 2 A.2d 804, 807 (1938). Our succeeding constitutions of 1790, of 1838, and of 1873 retained the separation of powers, *id.*, and it remains a foundational principle in our current Constitution, adopted in 1968. Although "[t]he dividing lines among the three branches are sometimes indistinct and are probably incapable of any precise definition," *Sweeney v. Tucker*, 473 Pa. 493, 375 A.2d 698, 705 (1977) (internal quotation marks omitted), the principle of separation of powers forbids any branch from exercising the functions exclusively committed to another branch, *Mockaitis*, 834 A.2d at 499; *Commonwealth v. Stern*, 549 Pa. 505, 701 A.2d 568, 570 (1997); *Sweeney*, 375 A.2d at 705; *Bailey v. Waters*, 308 Pa. 309, 162 A. 819, 821 (1932).

Under Article II, Section 1 of our Constitution, the legislative power of the Commonwealth is vested in the General Assembly. PA. CONST. art. II, § 1. The legislative power is the power "to make, alter and repeal laws." *Blackwell v. State Ethics Comm'n*, 523 Pa. 347, 567 A.2d 630, 636 (1989) (quoting *Mount Lebanon v. County Bd. of Elections*, 470 Pa. 317, 368 A.2d 648 (1977); *In re Marshall*, 363 Pa. 326, 69 A.2d 619, 626 (1949)). Article IV, Section 2 vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." PA. CONST. art. IV, § 2. The Governor's powers include his power to veto legislation to the extent that this power is vested in him by Sections 15 and 16 of Article IV. The Governor's exercise of his veto power is unique in that it is essentially a limited legislative power, particularly in the appropriations context. *Roddey v. County Council of County of Allegheny*, 841 A.2d 1087, 1091 (Pa. Cmwlth.2004) (*en banc*). Although the Constitution directs the Governor each year to "submit" a budget to the General Assembly, PA. CONST. art. VIII, § 12, appropriations are to be "made by the General Assembly," PA. CONST. art. VIII, § 13, and "[n]o money shall be paid out of the treasury, except on appropriations made by law," PA. CONST. art. III, § 24. So long as the General Assembly keeps the budget submitted by the Governor balanced, *see* PA. CONST. art. VIII, § 13(a), the

42

Constitution allows the General Assembly to deviate as much as it wishes from the Governor's proposals. "[T]he General Assembly enacts the legislation establishing those programs which the state provides for its citizens and appropriates the funds necessary for their operation[ ] [while] [t]he executive branch implements the legislation by administering the programs." *Shapp v. Sloan*, 480 Pa. 449, 391 A.2d 595, 604 (1978) (plurality opinion). This process is "fundamental within Pennsylvania's tripartite system." *Id.*

In administering the programs funded by the General Assembly, the executive branch must abide by all requirements and restrictions of the relevant legislation and may not spend more than the amount appropriated by the General Assembly. *Id.* Moreover, "[t]he executive branch may not of its own initiative use funds appropriated for one program in carrying out another and may not spend on a program more than its designated amount. It is in this way that the doctrine of separation of powers functions." *Id.*

Standing in stark contrast to his role of administrator of state programs that have already been funded is the Governor's power to disapprove of legislation before it is enacted. It should come as no surprise that the executive veto power is not inherent in our plan of government, having been altogether absent in our original constitution. As for the item veto, such power was not vested in the Governor until our 1873 constitution was adopted.

There is, of course, no constitutional definition of the term "item." In the provision's second mention of the phrase "item or items of," Section 16 provides that "the item or items **of appropriation** disapproved shall be void." PA. CONST. art. IV, § 16 (emphasis added). Section 16 here is referring to "any item" of which "[t]he Governor shall have power to disapprove." *Id.* In its first mention, however, Section 16 uses the broader phrase "item or items **of any bill,** making appropriations of money," *id.* (emphasis added). Section 16 is curious in this regard, but it is not unique.

The only item veto provision in the constitutions of our sister states that is materially identical to Section 16 is found in the Constitution of Connecticut—coincidentally, in Article IV, Section 16 of that document. Connecticut's experience is thus instructive. Connecticut's Section 16 reads as follows:

The governor shall have power to disapprove of any **item or items of any bill** making appropriations of money embracing distinct items while at the same time approving the remainder of the bill, and the part or parts of the bill so approved shall become effective and the **item or items of appropriations** so disapproved shall not take effect unless the same are separately reconsidered and repassed in accordance with the rules and limitations prescribed for the passage of bills over the executive veto. . . .

CONN. CONST. art. IV, § 16 (emphasis added). When presented with the question of whether Article IV, Section 16 of the Connecticut Constitution permitted the Governor to veto three sections of an appropriation bill that did not include appropriations of money, the Supreme Court of Connecticut decided as follows:

The defendants' basic claim is that the words "item or items" of the bill mean "part or parts" of the bill, whether those parts do or do not constitute appropriations. In other words, they claim that "item or items" and "part or parts" are interchangeable phrases with the same meaning.[6] Since the three sections of the act obviously constituted parts of the act, the defendants argue that the governor had the power to veto the three sections in question.

---

[6] Some support for this view may be found in *Commonwealth v. Barnett*, 199 Pa. 161, 173, 48 A. 976, a case decided at the turn of the century. We have neither found nor been referred to any other case giving any real support to this claim of the defendants.[14]

This construction of the words "item or items" as meaning the same as "part or parts" is not a permissible one for several reasons. In the first place, like any other enact-

14. As we will explain below, any support in *Barnett* for such a broad definition of "item" lacks precedential value.

ment, § 1[6] of article fourth [15] must be construed as an entirety, giving effect, if possible, to each sentence, clause or phrase in such a manner that none is treated as insignificant and unnecessary. The construction claimed by the defendants gives no effect to the phrase "item or items of appropriations so disapproved" which refers back to the earlier words "item or items."

Second, it is clear that the use of the words "part or parts of the bill so approved" is used in contradistinction to "item or items of appropriations so disapproved" because a bill might ... [improperly] contain matters of general legislation along with "appropriations of money embracing distinct items." The power of veto is limited to the "item or items of appropriations," but the approval of the balance of the bill might involve any part or parts of it whether they were, or were not, items of appropriation. Thus, in this particular special act, the governor could have vetoed any or all "items of appropriations" and approved the remainder of the bill which would have included the three sections of the bill in question. They would not be "items of appropriations," but they would be "parts of the bill" which the governor was empowered to approve.

Third, the obvious evil to which [Article IV, Section 16] was directed was that of forcing the governor to accept items of appropriation, which from the standpoint of good government he felt should not be made, in order to preserve the bulk of an appropriations bill which he might feel largely consisted of proper items of appropriation without which the government could not operate. This objective is attained under the foregoing construction.

Fourth, the fundamental reason why a partial disapproval or veto is not generally authorized, at least in the case of general legislation, is because of the separation of powers among the executive, legislative and judicial branches of the government. All affirmative legislative powers are given

15. The item veto provision of the 1955 Connecticut Constitution was numbered Section 15 of Article IV. Its pertinent language was the same as that which we quote above from Article IV, Section 16 of the 1965 Constitution.

exclusively to the General Assembly. If the governor were allowed to disapprove or veto parts of a bill involving general legislation, he could, in the case of many if not most such bills, by the exercise of that power, eliminate selected portions of a bill in such a manner as to change its meaning and thereby, in effect, enact an entirely different bill. This would usurp the legislative function, which is committed to the General Assembly alone. But such legislative action through the use of the veto power would be impossible if the veto power were restricted to distinct items of appropriation in a bill, whether that bill did, or did not, include other items of general legislation.

* * * *

We conclude that the governor had no constitutional power to veto or disapprove any of the three sections in question and that his action in purporting so to do was unconstitutional and void.

*Patterson v. Dempsey*, 152 Conn. 431, 207 A.2d 739, 745–47 (1965).

We think *Patterson* is both persuasive and consistent with the plain language and structure of our Constitution. Construing "item" for purposes of Article IV, Section 16 of our Constitution as any part of an appropriation bill would deprive the Section 16 phrase "item[s] of appropriation" of any effect and therefore must be disfavored. Moreover, it seems evident that, in initially using in Section 16 the phrase "item[s] of any bill making appropriations of money," the focus was not on providing a precise definition of "item" but on distinguishing the type of bill to which the Constitution was referring (*i.e.*, an appropriation bill) from that to which it had been referring in Article IV, Section 15 (*i.e.*, general legislation). Thus, the context of Section 16 indicates that a provision of an appropriation bill is an item if it directs that a specific sum of money be spent for a particular purpose. *See also* THE CYCLOPEDIC LAW DICTIONARY 602 (1940) (defining "item" as "a separate particular in an enumeration of a total which is separate and distinct from the other particulars or entries"); BLACK'S LAW DICTIONARY 832 (6th ed.1990) (defining "item" as "a separate

particular in an enumeration of a total") ("An 'item' in an appropriation is an individual sum of money dedicated to a state purpose." (citing *Commonwealth v. Dodson,* 176 Va. 281, 11 S.E.2d 120 (1940))); WEBSTER'S NEWWORLD DICTIONARY 750, 68 (2d college ed.1986) (defining "item" as "an article; unit; separate thing; particular; entry in an account," and "appropriation" as "money set aside for a specific use"); BLACK'S LAW DICTIONARY 110 (8th ed.2004) (defining "appropriation" as a "sum of money" that a "legislative body[ ] . . . set[s] aside . . . for a public purpose").

In defining "item" for purposes of Section 16, we are not constrained by this Court's decision in *Barnett.* The *Barnett* case concerned Section 8 of the general appropriation bill of 1899 ("Section 8"). Section 8 appropriated $5.5 million for the public schools for each of the fiscal years 1899–1900 and 1900–01. Section 8 further provided that

> out of the amount received by the city of Philadelphia there shall be paid the sum of three thousand dollars to the Teachers' Institute of said city; the sum of three thousand dollars to the Philadelphia School of Design for Women for their corporate purposes, and the sum of ten thousand dollars to the Teachers' Annuity and Aid Association of said city.

*Barnett,* 48 A. at 978. The then-Governor approved the appropriation bill with several exceptions, one of which concerned Section 8. With respect to Section 8, the Governor stated as follows:

> I approve of so much of this item which appropriates five million dollars annually, making ten million dollars for the two years beginning June 1, 1899, and withhold my approval from five hundred thousand dollars annually, making one million dollars for the two school years beginning the 1st day of June, 1899.

*Id.* at 984 (Mestrezat, J., dissenting).[16]

Thereafter, the Attorney General of Pennsylvania filed a petition in the Court of Common Pleas of Centre County,

---

16. The *Barnett* Majority Opinion does not set forth the text of the Governor's signing statement.

seeking a writ of mandamus directing the State Treasurer to determine a Centre County school district's *pro rata* share of the 1899 public school appropriation. As the Attorney General and State Treasurer agreed to waive all questions of jurisdiction, the common pleas court entertained the petition on its merits. Nevertheless, the court denied the writ and dismissed the Attorney General's petition.

On direct appeal, this Court was asked to decide: (1) whether the common pleas court had subject-matter jurisdiction over the case; and (2) whether the Governor had the "right ... in the exercise of his independent legislative judgment, to approve an appropriation in part, by reducing the amount fixed by the legislature." *Barnett,* 48 A. at 979 (so framing "[t]he question in this case"). Over the vigorous dissent of Justice S. Leslie Mestrezat, a majority of this Court affirmed the common pleas court's exercise of jurisdiction as well as its substantive decision. On the merits, after quoting Section 8 of the 1899 appropriation act, the majority offered the following observations:

> In this portion of the section alone there are included four distinct and severable parts, each of which is an "item," within the purpose, intent, and meaning of the constitutional provision under consideration, namely, the public schools, the Teachers' Institute, the School of Design for Women, and the Teachers' Annuity & Aid Association. The public schools being objects of appropriation by the express mandate of the constitution, the only question before the governor as to them was the amount, but the other three items presented the double consideration of the beneficiary and the amount.

*Id.* at 978. "On each of these matters," the majority opined, "the governor was entitled to exercise his independent legislative judgment separately, and to approve or disapprove accordingly." *Id.* "[W]hat he has done in the present case," the majority specified, was "to approve as to the object, and to disapprove as to a portion of the amount," and it was this action that the majority upheld as constitutional. *Id.*

While, earlier in the opinion, the majority did equate "item" for purposes of Article IV, Section 16, with "the particulars, the details, the distinct and severable parts, of [an] appropriation," *id.* at 977, the narrow issue presented did not give occasion for such a sweeping characterization of the Governor's Section 16 item veto power. It should come as no surprise, then, that after over a century of appellate jurisprudence in this Commonwealth, it appears that the holding of *Barnett* had never been construed, until this case, as anything more than the proposition that the Governor may decrease any particular amount appropriated by the General Assembly in a general appropriation bill. *See Adams County v. Commonwealth*, 502 Pa. 47, 463 A.2d 1002, 1007 n. 6 (1983) (citing *Barnett* for proposition that "Governor may disapprove any portion of amount contained in appropriations bill"); *Roddey v. County Council of County of Allegheny*, 841 A.2d 1087, 1090 (Pa.Cmwlth.2004) (*en banc*) ("[*Barnett*] involved an analysis of a governor's alleged constitutional power to exercise a reduction line-item veto.").[17] In any event, when the *Barnett* decision is understood in its full context, the *Barnett* majority's conception of the meaning of "item" for purposes of Section 16 is entirely consistent with the construction we discern today.

Moreover, our understanding of "item" in Section 16 as a sum of money directed by the General Assembly to be spent

17. The only other propositions for which *Barnett* has been cited deal with: (1) the purpose of the single-subject requirement of Article III, Section 3 of our Constitution, *see, e.g., Hosp. & Healthsystem Ass'n v. Dep't of Pub. Welfare*, 585 Pa. 106, 888 A.2d 601, 608 (2005); *Constitution Defense League v. Waters*, 309 Pa. 545, 164 A. 613, 614 (1933); *Uniontown Hosp. v. Dep't of Health*, 905 A.2d 560, 563 n. 9 (Pa.Cmwlth. 2006); *Common Cause v. Commonwealth*, 668 A.2d 190, 197 (Pa. Cmwlth.1995); (2) the role played by the executive in the legislative process or the deference owed to executive practice, *see, e.g., Commonwealth ex rel. Woodruff v. Benn*, 284 Pa. 421, 131 A. 253, 258 (1925); *Renshaw v. Mayor & Select & Common Councils of City of Philadelphia*, 248 Pa. 374, 93 A. 1080, 1082 (1915); *City of Erie v. Parade Street Market Co.*, 37 Pa.Super. 449, 451 (1908); and (3) the jurisdictional issues raised by the *Barnett* case, *see, e.g., Nevin v. Catanach*, 264 Pa. 523, 107 A. 856, 858 (1919); *Lewisburg Bridge Co. v. Union County*, 232 Pa. 255, 81 A. 324, 327 (1911); *Wisecup v. Wisecup*, 190 Pa.Super. 384, 154 A.2d 332, 335 (1959); *Commonwealth v. Meckes*, 144 Pa.Super. 381, 19 A.2d 555, 556 (1941).

for a particular purpose is consistent with interpretations rendered by a multitude of courts of last resort in various other jurisdictions. In *Bengzon v. Secretary of Justice of the Philippine Islands,* 299 U.S. 410, 412, 57 S.Ct. 252, 81 L.Ed. 312 (1937), on *writ of certiorari* to the Supreme Court of the Commonwealth of the Philippine Islands, the U.S. Supreme Court considered Section 19 of the Organic Act of August 29, 1916, 48 U.S.C. §§ 1052, 1053, which provided that "[t]he Governor General shall have the power to veto any particular item or items of an appropriation bill." "An item of an appropriation bill," the *Bengzon* Court observed, "obviously means an item which in itself is a specific appropriation of money, not some general provision of law which happens to be put into an appropriation bill." *Id.* at 414–15, 57 S.Ct. 252.

The item veto provisions of several state constitutions, like Section 16, include the phrase "item of any appropriation bill" or similar language. Even though those provisions are less restrictive than Section 16 in that they do not subsequently use a narrower term such as "item of appropriation," most of our sister courts have restricted "item" for purposes of those provisions to items of appropriation. *See, e.g., Alaska Legislative Council v. Knowles,* 21 P.3d 367, 371 (Alaska 2001) (defining "item" for purposes of ALASKA CONST. art. II, § 15 (vesting in governor power to "veto, strike or reduce items in appropriation bills") as "a sum of money dedicated to a particular purpose") (internal quotation marks omitted); *Colo. Gen. Assembly v. Owens,* 136 P.3d 262, 267 (Colo.2006) (holding that definitional headnotes are not "items" within meaning of COLO. CONST. art. IV, § 12 (empowering governor "to disapprove of any item or items of any bill making appropriations of money") "because they are not sums of money"); *Opinion of the Justices,* 306 A.2d 720, 723 (Del.1973) (holding that condition imposed upon prior appropriation could not be vetoed under DEL. CONST. art. III, § 18 (empowering governor "to disapprove of any item or items of any bill making appropriations of money") because it was not an "item of appropriation"); *Cenarrusa v. Andrus,* 99 Idaho 404, 582 P.2d 1082, 1090 (1978) (holding that IDAHO CONST. art. IV, § 11

(empowering governor "to disapprove of any item or items of any bill making appropriations of money") means that "he may disapprove only items of appropriation of money"); *Commonwealth v. Dodson*, 176 Va. 281, 11 S.E.2d 120, 127 (1940) ("An item of an appropriation bill is an indivisible sum of money dedicated to a stated purpose.") (construing precursor to VA. CONST. art. V, § 6(d) (empowering governor "to veto any particular item or items of an appropriation bill")); *see also Dickinson v. Page*, 120 Ark. 377, 179 S.W. 1004, 1005–06 (1915) (equating "item" as used in ARK. CONST. art. VI, § 17 (empowering governor "to disapprove any item, or items, of any bill making appropriation of money") with "item of appropriation"); *State ex rel. Brown v. Ferguson*, 32 Ohio St.2d 245, 291 N.E.2d 434, 439 (1972) (same with respect to OHIO CONST. art. II, § 16 (vesting in governor power to "disapprove any item or items in any bill making an appropriation of money")).[18] Even in states with provisions that are facially far broader than Section 16, some of our sister courts have rendered interpretations similar to the one we reach today.

**18.** The definition of "item" in other states with constitutional provisions using the phrase "item[s] of any appropriation bill" (or something materially identical) has not yet been decided. *See* ALA. CONST. art. V, § 126; HAW. CONST. art. III, § 16; MD. CONST. art II, § 17(e); MONT. CONST. art. VI, § 10(5); OR. CONST. art. V, § 15a; S.D. CONST. art. IV, § 4. A few states adhere to slightly broader interpretations of "item" for purposes of their counterparts to Section 16. *See Rants v. Vilsack*, 684 N.W.2d 193, 206 (Iowa 2004) (construing IOWA CONST. art. III, § 16 (allowing governor "to disapprove any item of an appropriation bill")); *Henry v. Edwards*, 346 So.2d 153, 158 (La.1977) (interpreting LA. CONST. art. IV, § 5(G) (allowing governor to "veto any line item in an appropriation bill")); *State ex rel. Link v. Olson*, 286 N.W.2d 262, 270–71 (N.D.1979) (construing N.D. CONST art. V, § 9 ("The governor may veto items in an appropriation bill.")).

Many states' counterparts to Section 16 consistently use the term "item[s] of appropriation[s]," "appropriation," or similar language. *See, e.g.*, ARIZ. CONST art. V, § 7; CAL. CONST. art. IV, § 10(e); FLA. CONST. art. III, § 8(a); GA. CONST. art. III, § 5, ¶XIII(e); ILL. CONST. art. IV, § 9(d); KAN. CONST. art. II, § 14(b); ME. CONST. art. IV, pt. 3, § 2–A ("dollar amount"); MICH. CONST. art. V, § 19 ("item[s] appropriating moneys"); MINN. CONST. art. IV, § 23; NEB. CONST. art. IV, § 15; N.J. CONST. art. V, § 1, ¶15; N.Y. CONST. art. IV, § 7; TEX. CONST art. IV, § 14; UTAH CONST. art. VII, § 8(3).

The constitutions of Indiana, Nevada, New Hampshire, North Carolina, Rhode Island, and Vermont do not invest the governor with an item veto power.

*See, e.g., Opinion of the Justices to the Senate,* 419 Mass. 1201, 643 N.E.2d 1036, 1039–40 (1994) (invalidating gubernatorial vetoes exercised under MASS. CONST. art. LXIII, § 5 (allowing governor to "disapprove or reduce items or parts of items in any bill appropriating money") where vetoed language did "not appropriate funds, but rather direct[ed] the way the funds appropriated . . . [were] to be used and qualif[ied] the appropriation"); *State v. Holder,* 76 Miss. 158, 23 So. 643, 645 (1898) (equating "parts" with appropriations for purposes of MISS. CONST. art. IV, § 73 (allowing governor to "veto parts of any appropriation bill")); [19] *State ex rel. Cason v. Bond,* 495 S.W.2d 385, 392 (Mo.1973) (holding that "item" for purposes of Mo. CONST. art. IV, § 26 (permitting governor to "object to one or more items or portions of items of appropriation of money in any bill presented to him") "refers to a separable sum of money appropriated"); *State ex rel. Wiseman v. Okla. Bd. of Corr.,* 614 P.2d 551, 555–56 (Okla.1978), *overruled on other grounds, Johnson v. Walters,* 819 P.2d 694 (Okla.1991) (construing OKLA. CONST. art. VI, § 12 (allowing governor to "disapprove[ ] [any appropriation] bill, or any item, or appropriation therein contained") as limited to appropriations of money).[20]

19. *See also Fordice v. Bryan,* 651 So.2d 998, 1002 (Miss.1995) (following *Holder* and invalidating governor's attempt "to veto a condition prescribed by the legislature rather than a distinct appropriation").

20. For other such broadly worded item veto provisions, see KY. CONST. § 88 (empowering governor "to disapprove any part or parts of appropriation bills embracing distinct items"); N.M. CONST art. IV, § 22 (to "disapprove any part or parts, item or items, of any bill appropriating money"); S.C. CONST. art. IV, § 21 (to disapprove "any one or more of the items or sections contained in any bill appropriating money"); TENN. CONST art. III, § 18 (to "reduce or disapprove the sum of money appropriated by any one or more items or parts of items in any bill appropriating money"); WASH. CONST art. III, § 12 (to "object to one or more sections or appropriation items"); W.VA CONST. art. VI, § 51(11) ("The governor may veto [a budget] bill, or he may disapprove or reduce items or parts of items contained therein."); WIS CONST art. V, § 10(1)(b) ("Appropriation bills may be approved in whole or in part by the governor. . . ."); WYO. CONST art. IV, § 9 (empowering governor "to disapprove of any item or items or part or parts of any bill making appropriations of money or property"). Such provisions are obviously distinguishable from Article IV, Section 16 of our Constitution.

In observing in *Barnett* that whether the Governor may reduce the amount of an appropriation in a general appropriation bill was a question of first impression, this Court noted that only two cases had been cited by counsel and that "neither of them is at all close." *Id.* at 979. The first case was decided in Arizona, where, the majority observed, the governor has no item veto power. The other case, *State v. Holder*, *supra*, arose, in the *Barnett* majority's words, when a Mississippi governor "approved [a] whole appropriation, but vetoed certain conditions appended to it," which the *Holder* court found unconstitutional. *Barnett*, 48 A. at 979. Indeed, in *Holder*, the Governor had vetoed the legislature's non-monetary condition on an appropriation to a college that "no part of the money hereby appropriated for wages or salaries be available unless the board of trustees shall first adopt and enact [certain] rules and by-laws." *Holder*, 23 So. at 644. Referring to *Holder* and the Arizona case, "[n]either of these cases," the *Barnett* majority noted, "affords us any assistance." *Barnett*, 48 A. at 979.

Turning to the four Challenged Vetoes of the instant case, we stress at the outset that our task is not to determine the wisdom of the language that the Legislature included and that the Governor purported to veto, as argued by *amici curiae* American Civil Liberties Union of Pennsylvania, *et al.* with respect to Section 219.[21] Nor is it our task to consider whether the failure to strike such language would leave a bill susceptible to a challenge under some other provision of our Constitution. Rather, our task is to construe the particular means of disapproval constitutionally vested in the Governor by Article IV, Section 16.

The first Challenged Veto involves Section 2010 of the 2005 GAA. Section 2010 is the last of ten discrete sections found in Part XX, entitled "Miscellaneous Provisions for 2005–

---

21. Nor is it our task to determine whether the language is consistent with any state or federal statute, which is the focus of the *amicus curiae* brief filed by Family Planning Council, *et al.* (arguing that vetoed Section 219 language violated certain state and federal Medicaid statutes and regulations).

2006." It authorized the Pennsylvania Department of Transportation ("PennDOT") "to make adjustments to construction contracts for highway capital projects involving steel entered into prior to March 1, 2004, where the adjustments are supported by mutual consideration." Like all other sections of Part XX, it is a non-monetary provision that makes no mention of any sum of money appropriated by the General Assembly for any purpose. Because, in the language of *Barnett*, Section 2010 includes no "subject" connected to an "amount," Section 2010 is not an "item" for purposes of Article IV, Section 16 and therefore is not susceptible to the Governor's item veto power under that provision of our Constitution.

 The next two Challenged Vetoes, concerning Sections 219 and 223 of the 2005 GAA, both involve restrictions on the discretion of state agencies. In Section 219 of the 2005 GAA, the General Assembly appropriated $921,080,000 in state funds and $1,288,555,000 in federal funds to DPW for outpatient services and, additionally, directed that: (1) DPW not expend funds for family planning services in excess of amounts expended for such services during the 2004–05 fiscal year; and (2) any such funds expended be subjected to the same restrictions contained in the appropriation for grants for women's medical services. Similarly, in Section 223 of the 2005 GAA, the General Assembly appropriated $137,393,000 to the State Police for general operations and, additionally, required that the State Police conduct a public hearing and provide thirty days' public notice before closing any State Police barracks. Rather than allocating any sum of money to the DPW or State Police, the Challenged Vetoes concerning Sections 219 and 223 merely restricted those agencies' discretion in administering the programs for which they are responsible. Neither the provision purportedly vetoed in Section 223 nor the provision purportedly vetoed in Section 219 contained any sum of funds that the General Assembly directed be spent for any purpose. These two Challenged Vetoes are in this respect analogous to the Mississippi governor's veto in *Holder*, which the *Barnett* Court found distinguishable from the reduction veto exercised in that case. For the reasons we have dis-

54

cussed at length above, neither of these two Challenged Vetoes was a constitutional exercise of the Governor's item veto power under Article IV, Section 16.

The last Challenged Veto concerns Section 801 of the 2005 GAA. Section 801 includes fifteen separate appropriations to PennDOT for various purposes, totaling nearly $1.5 billion. The particular appropriation in the provision that Governor Rendell purported to veto is $770.5 million for "the salaries, wages and all necessary expenses for the administration and operation of the maintenance program for State roads, bridges, tunnels and structures." Within the part of Section 801 appropriating $770.5 million for general transportation infrastructure maintenance, the General Assembly included three provisions earmarking three relatively small amounts for specific maintenance projects. The last of the three earmarks is for $1.5 million—about one-tenth of one percent of the total appropriation to PennDOT—for a pilot project to expand the width of pavement markings from four inches to six inches on limited-access highways. This discrete earmark is analogous to the three provisions of the 1899 appropriation bill in *Barnett* that set aside separate sums from the Philadelphia portion of the public school appropriation for the Teachers' Institute, the School of Design for Women, and the Teachers' Annuity & Aid Association. Although the Governor did not specifically veto these three provisions in that case,[22] this Court noted that each was an "item" for purposes of Article IV, Section 16 because each "present[ed] [to the Governor] the double consideration of the beneficiary and the amount." *Barnett*, 48 A. at 978. Likewise, here, the overall $770.5 million appropriation made by the General Assembly in Section 801 presented the Governor with the question of whether $1.5 million should be spent on the specific purpose of widening pavement markings. We therefore hold that Governor

22. Recognizing that this portion of the opinion was not necessary to the *Barnett* majority's holding, we are not bound by the Court's analysis of the three provisions of the 1899 appropriation act. Nevertheless, we find the Court's comments on the three provisions consistent with the definition of "item" for purposes of Article IV, Section 16 that we set forth today.

Rendell's veto of Section 801 provision was a valid exercise of his item veto power under Article IV, Section 16 of our Constitution.

In summary, we hold that Article IV, Section 16 of the Pennsylvania Constitution prohibits the Governor from effectively vetoing portions of the language defining an appropriation without disapproving the funds with which the language is associated. The Governor's vetoes of language in Sections 219, 223, and 2010 were such "language only" disapprovals, while the Governor's veto of the Section 801 provision was not. Accordingly, we reverse the order of the Commonwealth Court to the extent that it upheld the Governor's vetoes of language in Sections 219, 223, and 2010 of the General Appropriation Act of 2005, and we affirm that part of the order that upheld the Governor's veto of language in Section 801 of the 2005 GAA.

Jurisdiction relinquished.

Justices SAYLOR, EAKIN and BAER, Justice TODD and Justice McCAFFERY join the opinion.