# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Armstrong County Memorial :
Hospital and Monongahela :
Valley Hospital, Inc., :
      Petitioners :
 :
   v. : No. 438 M.D. 2012
 : Argued:  September 14, 2017
The Department of Public Welfare :
of the Commonwealth of Pennsylvania, :
      Respondent :

BEFORE: HONORABLE P. KEVIN BROBSON, Judge
     HONORABLE PATRICIA A. McCULLOUGH, Judge
     HONORABLE DAN PELLEGRINI, Senior Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**      **FILED:  October 16, 2017**

## I. INTRODUCTION

Petitioners Armstrong County Memorial Hospital and Monongahela Valley Hospital, Inc. (Hospitals) commenced this action against Respondent Department of Public Welfare of the Commonwealth of Pennsylvania (Department)[1] by filing a petition for review (Petition) addressed to this Court's original jurisdiction.  By order dated August 16, 2012, this Court granted intervenor status to

---

[1] The General Assembly redesignated the Department of Public Welfare as the Department of Human Services.  *See* Section 103 of the Human Services Code, Act of June 13, 1967, P.L. 31, added by the Act of September 24, 2014, P.L. 2458, 62 P.S. § 103.

the Hospital and Healthsystem Association of Pennsylvania (HAP).[2] Presently before the Court for disposition are the parties' cross-applications for summary relief.[3] For the reasons set forth below, we grant the Department's and HAP's joint application for summary relief and deny Hospitals' application for summary relief.

## II. BACKGROUND

The material facts in this case do not appear to be in dispute. To begin, we cite for background purposes *Armstrong County Memorial Hospital v. Department of Public Welfare*, 67 A.3d 160 (Pa. Cmwlth. 2013) (*Armstrong I*), our prior decision in this matter, disposing of the Department's and HAP's preliminary objections to the Petition:

> As this Court explained more thoroughly in *Commonwealth v. TAP Pharmaceutical Products, Inc.*, 36 A.3d 1112 (Pa. Cmwlth. 2011), [*vacated and remanded*, 94 A.3d 364 (Pa. 2014), the Department] is the state agency that administers the Commonwealth's Medicaid program. "Medicaid is a joint state-federal funded program for medical assistance in which the federal government approves a state plan [(State Plan)] for the funding of medical services for the needy and then subsidizes a significant portion of the financial obligations the state agreed to assume." *TAP*, 36 A.3d at 1122. [The Department] delivers Medicaid benefits in Pennsylvania through two (2) payment systems—(1) "fee-for-service," where the provider of the care is paid on a claim basis; and (2) "managed care," where an intermediary managed care organization (MCO), under contract with [the Department], is paid on a monthly, fixed-fee basis per enrollee. *Id.* at 1123. Because under the managed care model Medicaid funds go directly to the MCO and not to the provider of the healthcare service, the MCO pays the

---

[2] HAP is a statewide trade association for health care institutions. It represents over 250 hospitals and health systems in Pennsylvania. Hospitals are members of HAP.

[3] We will treat Hospitals' application for summary judgment as an application for summary relief pursuant to Rule 1532(b) of the Pennsylvania Rules of Appellate Procedure.

provider pursuant to the terms of an agreement between the MCO and the provider.

As alleged in the Petition, Hospitals have provider agreements with [the Department] to provide health care services to patients covered under the managed care portion of [the Department's] Medicaid program. Consequently, Hospitals also have contracts with certain MCOs, through which Hospitals are paid for the services they provide to the managed care Medicaid recipients.

In their Petition, Hospitals challenge certain aspects of the implementation of the Act of July 9, 2010, P.L. 336 (Act 49). Act 49 amended the [Human Services Code], Act of June 13, 1976, P.L. 31, *as amended*, 62 P.S. §§ 101-1503 (Code).[4] Relevant to this action are Section 443.1 of the Code, 62 P.S. § 443.1, and Article VIII-G of the Code, 62 P.S. §§ 801-G [to] 816-G, as they apply to the managed care side of the [the Department's] Medicaid program.

Section 443.1(1.1) of the Code, [added by the Act of July 31, 1968, P.L. 904, *as amended*, 62 P.S. § 443.1(1.1),] which was amended by Act 49 and also amended thereafter, addresses, *inter alia*, payment methods and standards by which [the Department] is to calculate payments to . . . hospitals for inpatient services provided on or after July 1, 2010, on a fee-for-service basis. One of those methods and standards is a requirement that [the Department] use the "All Patient Refined-Diagnosis Related Group," or APR/DRG system, for purposes of classifying inpatient stays into diagnosis related groups, or DRGs. [The Department] then assigns base rates to each DRG, which are then used to arrive at the appropriate fee-for-service reimbursement rates for hospitals. By its own terms, the provisions of paragraph (1.1) only apply to the Commonwealth fiscal years in which [the Department] imposes an assessment authorized

---

[4] The Code was formerly known as the Public Welfare Code. Section 1 of the Act of December 28, 2015, P.L. 500, amended Section 101 of the Public Welfare Code, 62 P.S. § 101, to change the short title of the act to the Human Services Code.

3

under new Article VIII-G of the Code, added by Act 49[, *as amended*], referred to as the Quality Care Assessment (Assessment). . . .[5]

With respect to managed care, Section 443.1(1.2) of the Code[, added by the Act of July 31, 1968, P.L. 904, *as amended*, 62 P.S. § 443.1(1.2),] includes certain provisions governing the rates that MCOs pay hospitals. As amended by Act 49, paragraph (1.2), like paragraph (1.1), applied to every fiscal year in which [the Department] imposed the Assessment. Paragraph (1.2), however, has since been amended by the Act of June 30, 2011, P.L. 89, limiting the application of paragraph (1.2) to only the Commonwealth's fiscal year 2010-2011.

*Armstrong I*, 67 A.3d at 162-64 (footnote omitted).

Currently, Section 443.1(1.2) of the Code provides, in pertinent part:

(1.2) Subject to section 813-G, for inpatient acute care hospital services provided under the physical health medical assistance managed care program during State fiscal year 2010-2011, the following shall apply:

(i) For inpatient hospital services provided under a participation agreement between an inpatient acute care hospital and a medical assistance managed care organization in effect as of June 30, 2010, the medical assistance managed care organization shall pay, and the hospital shall accept as payment in full, amounts determined in accordance with the payment terms and rate methodology specified in the agreement and in effect as of June 30, 2010, during the term of that participation agreement. . . .

(ii) Nothing in subparagraph (i) shall prohibit payment rates for inpatient acute care hospital services provided under a participation agreement to change from the

---

[5] To date, the General Assembly has authorized the imposition of the Assessment on a fiscal year basis for fiscal years 2010-2011 through 2017-2018. *See* Sections 803-G and 815-G of the Code, added by the Act of July 9, 2010, P.L., 336, *as amended*, 62 P.S. §§ 803-G and 815-G.

4

rates in effect as of June 30, 2010, if the change in payment rates is authorized by the terms of the participation agreement between the inpatient acute care hospital and the medical assistance managed care organization. . . .

. . . .

(v) The [D]epartment shall make enhanced capitation payments to medical assistance managed care organizations exclusively for the purpose of making supplemental payments to hospitals in order to promote continued access to quality care for medical assistance recipients. Medical assistance managed care organizations shall use the enhanced capitation payments received pursuant to this section solely for the purpose of making supplemental payments to hospitals and shall provide documentation to the [D]epartment certifying that all funds received in this manner are used in accordance with this section. The supplemental payments to hospitals made pursuant to this subsection are in lieu of increased or additional payments for inpatient acute care services from medical assistance managed care organizations resulting from the [D]epartment's implementation of payments under paragraph (1.1)(ii). Medical assistance managed care organizations shall in no event be obligated under this section to make supplemental or other additional payments to hospitals that exceed the enhanced capitation payments made to the medical assistance managed care organization under this section. Medical assistance managed care organizations shall not be required to advance the supplemental payments to hospitals authorized by this subsection and shall only make the supplemental payments to hospitals once medical assistance managed care

organizations have received the enhanced capitation payments from the [D]epartment.

(vi) Nothing in this subsection shall prohibit an inpatient acute care hospital and a medical assistance managed care organization from executing a new participation agreement or amending an existing participation agreement on or after July 1, 2010, in which they agree to payment terms that would result in payments that are different than the payments determined in accordance with subparagraphs (i), (ii), (iii) and (iv).

In *Armstrong I*, we also noted that:

Act 49 also amended the Code to authorize [the Department] to impose the Assessment on covered hospitals. Section 802-G of the Code, 62 P.S. § 802-G. Each covered hospital's assessment is calculated by applying a fixed percentage to the hospital's net inpatient revenue. Section 803-G of the Code, 62 P.S. § 803-G. Though the statutory language is somewhat convoluted, the apparent purpose of the Assessment was to generate funds that would be used to augment payments to hospitals that provide services to medical assistance patients, either by direct payment under the fee for service side of the program or indirectly by enhanced capitation payments to MCOs, which, in turn, would provide supplemental payments to their contracted hospitals. Sections 443.1(1.1)-(1.2), 802-G of the Code.

The implementation of these augmented reimbursement provisions is dependent on the authority of [the Department] to impose the Assessment under both state and federal law. Although Act 49 provided [the Department] with the state authority to impose the Assessment, it was necessary for [the Department] to also secure approval of the Assessment as a permitted "health care-related tax" from the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services (CMS). *See* 42 C.F.R. Pt. 433, Subpt. B; Sections 443.1(1.1)(ii), 803-G(a), 807-G of the Code. (Pet. ¶ 18.)

6

*Armstrong I*, 67 A.3d at 165-66 (footnote omitted).

In order to obtain approval of the Assessment from CMS, the Department needed to obtain a waiver permitting it to implement the Assessment. The Department also needed to obtain approval of certain amendments to the State Plan, permitting it to alter the way in which it both reimbursed hospitals for Medicaid services and made supplemental payments to hospitals under the fee-for-service payment system. Finally, the Department needed to obtain approval of an amendment to its agreements with the MCOs (MCO Agreements) related to the enhanced capitation payments that would be paid to the MCOs.

On July 6, 2010, the Department and HAP entered into a letter of agreement (July Letter Agreement), wherein HAP and the Department agreed to work together "to achieve the necessary federal approvals" from CMS relative to "the hospital fee-for-service, supplemental, and managed care enhanced payments pursuant to [Act 49]." (App. to Hospitals' Statement of Undisputed Material Facts (SUMF) at 194.) The July Letter Agreement contained a very specific and detailed formula regarding how the MCOs would be required to distribute the enhanced capitation payments to hospitals. On that same date, the Department also sent a letter to each of the MCOs in Pennsylvania, explaining the process by which the enhanced capitation payments would be paid to the MCOs and then distributed to hospitals as supplemental payments.

The Department began the CMS-approval process in the summer of 2010. As part of this process, the Department sought to include in its MCO Agreements a description of the formula that the MCOs would use to distribute the enhanced capitation payments to hospitals through supplemental payments—*i.e.*, the formula identified in the July Letter Agreement.

In August 2010, CMS indicated, *inter alia*, that while it is acceptable for the Department to demand that all of the revenue from the enhanced capitation payments be distributed to hospitals through the supplemental payments, it is not acceptable for the Department to dictate how the MCOs would distribute the revenue to hospitals. Not believing that the statements of certain CMS officials represented CMS's official position on the matter, the Department continued to engage in discussions with CMS over the next several months, seeking to obtain permission to include language regarding how the MCOs would distribute the supplemental payments to hospitals in the MCO Agreements.

At the same time, the Department continued to work with HAP and the Coalition of Medical Assistance Managed Care Organizations (MCO Coalition)[6] to implement Act 49. The involved individuals[7] discussed what else could be done in the event that CMS did not permit the Department to dictate how the MCOs would distribute the enhanced capitation payments to hospitals. On August 20, 2010, Allen Fisher (Fisher), the Director of the Financial Analysis Division in the Department's Bureau of Managed Care Operations, stated in an email: "It looks like the MCOs and hospitals will have to negotiate the use of the [enhanced capitation payments]. We think we will try to organize this. We anticipate this will be difficult." (App. to Hospitals' SUMF at 208.) The agenda from an August 26, 2010 Department meeting indicated that Bussard and Nardone "should talk offline" about the feedback that the Department had received from CMS. (App. to Hospitals' SUMF at 206.) On September 8, 2010, Bussard sent an email to Carolyn Scanlan (Scanlan), HAP's

_____

[6] The MCO Coalition represents the interests of MCOs.

[7] The main individuals involved with the implementation of Act 49 were Michael Nardone (Nardone), the Department's then-Acting Secretary, Izanne Leonard-Haak (Leonard-Haak), the Department's then-Acting Deputy Secretary for Medical Assistance Programs, Paula Bussard (Bussard) of HAP, and Michael Rosenstein (Rosenstein) of the MCO Coalition.

8

President, explaining potential alternatives in the event that CMS did not permit the Department to direct how the MCOs distributed the enhanced capitation payments to hospitals. In that email, Bussard indicated that an "[a]greement [c]ould be entered into between the hospital community and the MCOs to pay consistent with the provisions that [the Department] negotiated with the MCOs to secure support for [the] passage of Act 49." (App. to Hospitals' SUMF at 373.)

In late December 2010, CMS provided the Department with final approval and instructions for the implementation of Act 49. Ultimately, CMS approved the arrangement for supplemental payments to hospitals through the imposition of the Assessment and the migration to the APR/DRG system, but it precluded the Department from directing the MCOs regarding how to distribute the enhanced capitation payments to hospitals because CMS determined that such a scheme would violate 42 C.F.R. § 438.60.[8] Nardone relayed CMS's position to Scanlan and Bussard in an email dated December 28, 2010. In that email, Nardone stated: "To keep this moving, I think we need to get the approvals and move to Plan B. I am disappointed they did not see this our way but we gave it our best shot. We can still make this work." (App. to Hospitals' SUMF at 372.) In reply to Nardone's email, Scanlan indicated that obtaining the approvals and moving on to Plan B "was the clear option given CMS'[s] position and the clear need to get the approvals of the [S]tate [P]lan amendment and the waiver before the 90 day clock expires." (App.

---

[8] 42 C.F.R. § 438.60 provides:

The State agency must ensure that no payment is made to a network provider other than by the MCO, [the prepaid inpatient health plan (PIHP)], or [the prepaid ambulatory health plan (PAHP)] for services covered under the contract between the State and the MCO, PIHP, or PAHP, except when these payments are specifically required to be made by the State in Title XIX of the Act, in 42 CFR chapter IV, or when the State agency makes direct payments to network providers for graduate medical education costs approved under the State plan.

9

to Hospitals' SUMF at 371.) On that same date, Bussard also forwarded Nardone's email to other individuals at HAP, stating: "2 out of 3. We are going to have to go to Plan B on MCOs." (App. to Hospitals' SUMF at 60.)

By letter dated January 14, 2011, the Department and HAP amended the July Letter Agreement (January Revised Letter Agreement) to remove the language specifying the formula to be used by the MCOs to distribute the enhanced capitation payments to hospitals. With respect to the MCOs, the January Revised Letter Agreement read as follows:

> **Managed Care Payments**
> The following replaces the Managed Care Enhanced Payments section of the [July Letter Agreement].
>
> CMS will only permit [the Department] to require each MCO to demonstrate that it has utilized all of the funding to increase the payments to hospitals for inpatient acute care services in FY 2010-2011. [The Department] will include funding in its capitation payments to MCOs as planned, and [the Department] will require each MCO to demonstrate that it has utilized the full funding to increase the payments to hospitals for inpatient acute care services in FY 2010-2011.

(App. to Hospitals' SUMF at 102.) On that same date, the Department added an updated Appendix 14 to the MCO Agreements, which only requires that the MCOs distribute all of the enhanced capitation payments received from the Department to hospitals and that the MCOs provide documentation to the Department verifying the same.[9]

Shortly thereafter, HAP reached out to the MCO Coalition to begin discussions about a possible agreement between HAP and the MCO Coalition regarding the distribution of the enhanced capitation payments to hospitals. As a

---

[9] CMS reviewed and approved the language contained in updated Appendix 14 by letter dated February 25, 2011.

starting point of discussion, HAP planned to use the distribution formula that it had advocated for as part of the July Letter Agreement between HAP and the Department. On February 11, 2011, HAP and the MCO Coalition entered into an agreement (HAP/MCO Agreement), detailing the methodology that would be used by the MCOs to distribute the enhanced capitation payments to hospitals through supplemental payments. Implementation of the HAP/MCO Agreement required the Department's involvement because the HAP/MCO Agreement required HAP to prepare a report using data supplied by the Department that identified hospital-specific percentages for each plan. The Department provided HAP with most of the data that it had requested, but the Department was reluctant to share more because the MCOs view the terms of their agreements with hospitals as confidential.

On July 2, 2012, Hospitals filed their Petition with this Court. In their Petition, Hospitals set forth four causes of action and sought declaratory relief, a permanent injunction, a writ of mandamus, and an award of attorneys' fees and costs. On August 17, 2012, the Department and HAP filed preliminary objections to the Petition. By Opinion and Order dated May 20, 2013, this Court: (1) overruled the Department's preliminary objections; (2) sustained HAP's preliminary objections in the nature of a demurrer to Counts I, III, and IV of Hospitals' Petition and dismissed those counts; (3) overruled HAP's remaining preliminary objections; and (4) directed the Department and HAP to file an answer to Count II, the remaining claim in the Petition. In Count II of the Petition, Hospitals allege that the Department "violated the State Plan [a]mendment[s] as approved by CMS by implementing the 'pass through' payment scheme negotiated by HAP with the . . . MCOs." (Pet. ¶ 58.) As we stated in *Armstrong I*, in order to prove Count II and establish that the Department "acted contrary to the CMS-approved State Plan amendments,"

11

Hospitals must produce evidence that the Department directly or indirectly "impose[d] on [the] MCOs the manner in which the MCOs were to distribute the enhanced capitation payments MCOs receive from [the Department] to hospitals under [Act 49]." *Armstrong I*, 67 A.3d at 175.

The Department and HAP each filed answers to the Petition on July 1, 2013. Subsequent thereto, the parties engaged in a period of discovery. On June 1, 2017, at the conclusion of the discovery period, Hospitals filed an application for summary relief, requesting summary relief only on their claim for declaratory relief. On that same date, the Department and HAP filed a joint application for summary relief.

### III. STANDARD FOR SUMMARY RELIEF

Pa. R.A.P. 1532(b) provides that "[a]t any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear." "Summary relief under Pa. R.A.P. 1532(b) is similar to the relief envisioned by the rules of civil procedure governing summary judgment." *Brittain v. Beard*, 974 A.2d 479, 484 (Pa. 2009). "'An application for summary relief may be granted if a party's right to judgment is clear and no material issues of fact are in dispute.'" *Jubelirer v. Rendell*, 953 A.2d 514, 521 (Pa. 2008) (quoting *Calloway v. Pa. Bd. of Prob. & Parole*, 857 A.2d 218, 220 n.3 (Pa. Cmwlth. 2004)).

### IV. DISCUSSION

### A. Hospitals' Application for Summary Relief

In their application for summary relief, Hospitals argue that the record clearly demonstrates that the Department's implementation of the enhanced capitation payments to the MCOs and the MCOs' use of those payments to make

12

supplemental payments to hospitals is invalid and inconsistent with Act 49 and Section 443.1(1.2)(v) of the Code, and, therefore, there is no genuine issue of material fact and they are entitled to judgment as a matter of law.[10] More specifically, Hospitals argue that the "pass-through" payment scheme implemented by the Department for the distribution of the supplemental payments to the hospitals as funded by the Assessment violated CMS's rules and directives. Hospitals argue further that the undisputed evidence establishes that the Department concocted "Plan B," which amounted to an "end-run" around CMS's mandate that the Department could not direct the method by which the MCOs distributed the enhanced capitation payments to hospitals. Hospitals also argue that "[i]t was the Department that came up with the idea of having HAP and the MCO Coalition agree to implement the Act 49 supplemental payment scheme if CMS did not approve it." (Hospitals' Br. at 29.) Hospitals further argue that "the Department conceived of the scheme, directed that it be carried out, and provided the information that HAP and the MCO Coalition needed to make it work." (Hospitals' Br. at 32.)

In support of their position, Hospitals direct this Court's attention to, *inter alia*: (1) email communications between the involved parties that reference a "Plan B;" (2) Fisher's August 20, 2010 email communication; and (3) Nardone's

---

[10] In their application for summary relief and throughout their brief and supplemental brief, Hospitals seem to suggest that the "pass-through" payment scheme agreed to by HAP and the MCO Coalition and implemented by the Department violated federal law and the regulations governing Medicaid managed care because it used historical data and was not actuarially sound. We will not consider this argument, as the only remaining claim before the Court is Count II of the Petition and the issue relative to Count II is whether the Department directly or indirectly "impose[d] on [the] MCOs the manner in which the MCOs were to distribute the enhanced capitation payments MCOs receive from [the Department] to hospitals under [Act 49]." *Armstrong I*, 67 A.3d at 175.

indication that he "should talk offline" with Bussard.[11]   Hospitals argue that this evidence establishes that "the Department implemented the pass through scheme indirectly through HAP and the MCO Coalition[] and never told CMS about it." (Hospitals' Br. at 32.)  Hospitals are essentially "reading" their desired version of events into the evidence and are asking this Court to do the same.  Hospitals are asking this Court to believe their narrative of the events that transpired after CMS informed the Department that it could not direct the manner in which the MCOs distributed the enhanced capitation payments to hospitals.  This we cannot do. Hospitals' narrative of events is based on unreasonable inferences that are not supported by the evidence adduced during discovery.  Hospitals have not directed this Court to a single piece of evidence that could establish that the Department violated CMS's directive.  Hospitals have not identified any evidence establishing that: (1) the Department directly or indirectly influenced HAP or the MCO Coalition to adopt its methodology regarding the MCOs' distribution of the enhanced capitation payments to hospitals; (2) the Department directed or required HAP and the MCO Coalition to adopt its methodology regarding the MCOs' distribution of

_____

[11] In their supplemental brief, Hospitals direct this Court's attention to:  (1) a July 24, 2010 email communication to Nardone from Patricia Brady at Sellers Dorsey, a company that the Department contracted with to provide certain professional and consulting services in connection with the implementation of Act 49; and (2) two sets of handwritten notes from a conversation with Charles Miller (Miller), an attorney providing legal advice to the Department.  The email communication and notes reference Miller's concerns regarding the use of "pass through" language and historical data.  Hospitals argue that these documents "reveal that Plan B actually was concocted *before Act 49 was finally enacted into law*" and "that the Department received legal advice that Act 49's scheme would not pass muster with CMS and saw Plan B as a way to hide the scheme from CMS." (Hospitals' Supp. Br. at 3 (emphasis in original).)  To the extent that Hospitals cite this evidence to establish that the "pass-through" payment scheme agreed to by HAP and the MCO Coalition and implemented by the Department violated federal law and the regulations governing Medicaid managed care, we decline to consider it for the reasons set forth in footnote 10.  Alternatively, to the extent that Hospitals cite this evidence to establish that the Department violated CMS's directive, we rely on our analysis set forth in Section IV.A of this opinion.

14

the enhanced capitation payments to hospitals; (3) the Department directed or required HAP and the MCO Coalition to enter into the HAP/MCO Agreement; or (4) HAP or the MCO Coalition presented the HAP/MCO Agreement to the Department for review and/or approval before it was executed. Hospitals have also not identified any evidence that the reference to "Plan B" was anything other than a generic recognition of a need for an alternative plan or that the Department improperly devised "Plan B" and/or required HAP and the MCO Coalition to implement a specific "Plan B."

The fact that the HAP/MCO Agreement contains the same and/or similar methodology as the July Letter Agreement is irrelevant. As representatives of hospitals and MCOs, HAP and the MCO Coalition were free to enter into any agreement that they believed to be in the best interests of hospitals and the MCOs. There is no evidence that CMS prohibited the use of the methodology set forth in the July Letter Agreement or the involvement of HAP or the MCO Coalition in the process. The Department's statement that it would try to organize a negotiation between the MCOs and hospitals—*i.e.*, Fisher's August 20, 2010 email communication—does not establish anything other than the Department was trying to get HAP and the MCO Coalition to work together on an alternative for the distribution of the enhanced capitation payments to hospitals. Moreover, communications between the Department, HAP, and the MCO Coalition after CMS informed the Department that it is not acceptable for the Department to dictate how the MCOs would distribute the revenue to hospitals—officially in December 2010 with the final approval for the implementation of Act 49 and unofficially in August 2010—were not improper. Even though the Department was not permitted to direct the manner in which the enhanced capitation payments would be distributed

15

to hospitals, the Department was permitted to continue communications with HAP and the MCO Coalition, as the Department remained responsible for the implementation of Act 49 and communications with these entities as the representatives of hospitals and the MCOs was necessary. Similarly, the fact that the Department provided data to HAP so that HAP and the MCO Coalition could proceed with the HAP/MCO Agreement does not prove anything more than the Department continued with its implementation of Act 49 as it was required to do.

In sum, Hospitals' application for summary relief is based on unreasonable inferences drawn from the evidence produced during discovery. Because Hospitals have not presented any evidence to establish that the Department directed the manner in which the MCOs were required to distribute the enhanced capitation payments to the hospitals in violation of CMS's directive, we must deny Hospitals' application for summary relief.

**B. The Department's and HAP's Joint Application for Summary Relief**

In their joint application for summary relief, the Department and HAP argue that "[t]he undisputed deposition testimony and evidence produced in discovery demonstrate that the Department was not improperly involved in determining or imposing the methodology for the distribution of funds by MCOs to hospitals." (Department's and HAP's Application at ¶ 13.) More specifically, the Department and HAP argue that Hospitals "have failed to adduce any evidence demonstrating that the Department in any way 'imposed' the manner in which the MCOs would distribute enhanced capitation payments to hospitals under Act 49" and that, "[t]o the contrary, the evidence—and the depositions [of Bussard, Leonard-Haak, Rosenstein, and Nardone] in particular—make clear that, following CMS's late December 2010 final decision that the Department could not be involved in

16

determining how such payments would be made, the Department removed itself from any role in making such a determination." (Department's and HAP's Br. at 13-14.) In response, Hospitals argue that the Department's and HAP's reliance on the self-serving testimony of their own witnesses—*i.e.*, Bussard, Nardone, and Leonard-Haak—is misplaced because such self-serving evidence, even if uncontradicted, cannot provide a sufficient basis for the grant of summary relief under the long-standing rule articulated in *Borough of Nanty-Glo v. American Surety Co. of New York*, 163 A. 523 (Pa. 1932).[12] Hospitals argue further that the testimony of these witnesses is also insufficient to establish that there is no genuine issue of material fact entitling the Department and HAP to summary relief.

The Department's and HAP's joint application for summary relief is a "put up or stand down" application. To be successful, the Department and HAP need not affirmatively establish that the Department did not direct the MCOs regarding how to distribute the enhanced capitation payments to hospitals. As petitioners in this original jurisdiction matter, Hospitals bear the burden of proof at trial. Consequently, the Department and HAP must only show that Hospitals cannot establish through admissible evidence that the Department directly or indirectly imposed upon the MCOs the manner by which they were to distribute the enhanced capitation payments that they received from the Department to hospitals—*i.e.*, that Hospitals do not have sufficient evidence to prove their case.[13] Even if we look at

---

[12] "The *Nanty-Glo* rule means that: 'Testimonial affidavits of the moving party or his witnesses, not documentary, even if uncontradicted, will not afford sufficient basis for the entry of summary judgment, since the credibility of the testimony is still a matter for the jury.'" *Penn Ctr. House, Inc. v. Hoffman*, 553 A.2d 900, 903 (Pa. 1989) (quoting *Goodrich-Amram* 2d § 1035(b)).

[13] To be successful in their joint application for summary relief, the Department and HAP need not affirmatively establish that the Department did not direct the manner in which the MCOs

17

the evidence in the light most favorable to Hospitals, there is a dearth of any evidence supporting Hospitals' claims in Count II of the Petition. Thus, for the same reasons that we must deny Hospitals' application for summary relief, we must grant the Department's and HAP's joint application for summary relief.

## V. CONCLUSION

Accordingly, Hospitals' application for summary relief is denied, the Department's and HAP's joint application for summary relief is granted, and the Petition is dismissed with prejudice.

_____
P. KEVIN BROBSON, Judge

---

would distribute the enhanced capitation payments to hospitals. As stated above, the Department and HAP need only establish that Hospitals have not set forth sufficient evidence to meet their burden of proof at trial. For these reasons, the *Nanty-Glo* rule does not apply as the Department and HAP are relying on the deposition testimony of Bussard, Nardone, and Leonard-Haak not as direct evidence to prove that the Department did not violate CMS's directive, but to further establish that Hospitals have not put up sufficient evidence to establish their claims.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Armstrong County Memorial     :
Hospital and Monongahela     :
Valley Hospital, Inc.,     :
         Petitioners     :
     :
         v.     :  No. 438 M.D. 2012
     :
The Department of Public Welfare     :
of the Commonwealth of Pennsylvania,  :
         Respondent     :

# O R D E R

AND NOW, this 16th day of October, 2017, the Application for Summary Judgment filed by Petitioners Armstrong County Memorial Hospital and Monongahela Valley Hospital, Inc. (Hospitals), which the Court shall treat as an application for summary relief filed pursuant to Pa. R.A.P. 1532(b), is hereby DENIED; the Joint Application for Summary Relief filed by the Department of Public Welfare of the Commonwealth of Pennsylvania (now referred to as the Department of Human Services) and the Hospital and Healthsystem Association of Pennsylvania is hereby GRANTED; and Hospitals' Petition for Review is hereby DISMISSED with prejudice.

_____
P. KEVIN BROBSON, Judge