**[J-49A-2017] [MO: Saylor, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| IN RE: ANGELES ROCA FIRST JUDICIAL DISTRICT PHILADELPHIA COUNTY | : | No. 42 EAP 2016 |
| | : | |
| | : | Appeal from the Order dated December |
| | : | 16, 2016 of the Court of Judicial |
| | : | Discipline at No. 14 JD 2015 |
| APPEAL OF: ANGELES ROCA | : | |
| | : | ARGUED: May 9, 2017 |

**DISSENTING OPINION**

**JUSTICE DONOHUE**                                 **DECIDED: November 22, 2017**

In this appeal as of right, Philadelphia County Court of Common Pleas Judge Angeles Roca ("Roca") challenges the December 16, 2016 Order and Opinion of the Court of Judicial Discipline (the "CJD") permanently removing her from judicial office.[1] This Court must determine whether the CJD's removal sanction is "lawful" pursuant to our constitutionally prescribed standard of review regarding sanctions imposed by the CJD. *See* Pa. Const. art. V, § 18(c)(2). Specifically, we must determine whether the CJD is required to follow the discretion-limiting doctrine of stare decisis when imposing sanctions. I am of the view that the CJD is bound to do so. In holding to the contrary, the Majority, without explanation, abrogates a foundational precept of our common law system of jurisprudence and, in my view, interprets Article V, Section 18 in a way that the citizens of this Commonwealth never intended. The result is that a court of

---

[1] Roca does not dispute that she violated provisions of the Code of Judicial Conduct, engaged in conduct that prejudiced the proper administration of justice and brought her judicial office into disrepute.

appointed judges may, with unbridled discretion, remove an elected jurist from office. For the reasons that follow, I dissent.

This Court's standard of review[2] regarding sanctions imposed by the CJD is set forth in Article V, Section 18 of the Pennsylvania Constitution:

---

[2] The Majority accepts as appropriate, without analysis, the use of the term "scope of review" as a proxy for "standard of review" in Article V, Section 18(c)(2), despite this Court's express distinction between scope and standard of review:

> "**Scope** of review" refers to the confines within which an appellate court must conduct its examination. In other words, it refers to the **matters** (or "what") the appellate court is permitted to examine. In contrast, "**standard** of review" refers to the **manner** in which (or "how") that examination is conducted.

*Morrison v. Com., Dep't of Pub. Welfare, Office of Mental Health (Woodville State Hosp.)*, 646 A.2d 565, 570 (Pa. 1994) (first and last emphasis added) (internal citations omitted). At the very least it must be acknowledged that Article V, Section 18(c)(2) was poorly drafted. It is our goal to discern the intent of the adopters of the Constitutional amendment and our rules of constitutional interpretation require us to give words their ordinary meaning and to give effect to all constitutional provisions. *See Jubelirer v. Rendell*, 953 A.2d 514, 528 (Pa. 2008). A technical legal term in the Constitution, however, must be given the meaning understood by those sophisticated in the law at the time of enactment. *See Robinson Twp., Washington Cty. v. Com.*, 83 A.3d 901, 956 (Pa. 2013); *cf.* 1 Pa.C.S. § 1903(a) (technical words that have acquired a peculiar and appropriate meaning must be interpreted according to that meaning).

As to sanctions, it is clear that "scope of review," as that phrase is used in Article V, Section 18(c)(2), cannot be assigned its peculiar and appropriate meaning. It must have been intended to mean "standard of review," since the constitutional provision is concerned with the question of "how" this Court's review is conducted. Although this Court has recognized that "scope of review" and "standard of review" were "often – albeit erroneously – used interchangeably," we have also made it clear that any confusion regarding the terms was unfounded because, plainly, "the two terms carry distinct meanings and should not be substituted for one another." *Morrison*, 646 A.2d at 570. Accordingly, throughout this opinion, when discussing the manner in which this Court reviews sanctions, I use the term "standard of review." Regarding our scope of review as to sanctions, I agree with the Majority that Article V, Section 18(b)(5) requires us to review the entire record. *See* Majority Op. at 21.

> On appeal, the Supreme Court … shall review the record of the proceedings of the [CJD] as follows: on the law, the scope of review is plenary; on the facts, the scope of review is clearly erroneous; and as to sanctions, the scope of review is whether the sanctions imposed were lawful. The Supreme Court … may revise or reject an order of the [CJD] upon a determination that the order did not sustain this standard of review; otherwise, the Supreme Court … shall affirm the order of the [CJD].

Pa. Const. art. V, § 18(c)(2). The Majority holds that we are bound only to determine whether a sanction is "lawful" and that our standard of review in this regard is perfunctory, as it only allows this Court to confirm that the sanction imposed by the CJD was "available." *See* Majority Op. at 17, 21. In reaching this conclusion, the Majority indicates that "available" sanctions are those sanctions that the CJD may impose or, to be more specific, those sanctions listed in Article V, Section 18 – namely, "removal from office, suspension, censure or other discipline … ." Pa. Const. art. V, § 18(b)(5). That sanctions must also be "warranted by the record" is, according to the Majority, the only limitation on the concept that a "lawful" sanction must merely fall "into a category which is theoretically 'available' to the CJD." Majority Op. at 21. I challenge the Majority's interpretation of our standard of review on several grounds.

First, contrary to the Majority, I believe we must engage in meaningful constitutional interpretation regarding our intended standard of review. In interpreting constitutional language, "the fundamental rule of construction which guides [this Court] is that the Constitution's language controls and must be interpreted in its popular sense, as understood by the people when they voted on its adoption." *Ieropoli v. AC & S Corp.,* 842 A.2d 919, 925 (Pa. 2004). Nothing in the text of Article V, Section 18 requires us to interpret the word "lawful" as synonymous with "available." To the

contrary, defining "lawful" to mean "available" strips the term of its plain and ordinary meaning. Indeed, this Court creates the definition out of whole cloth. If the adopters intended the Majority's outcome, Article V, Section 18(c)(2) would have used the term "available" and not "lawful." In my view, what is "lawful" is, plainly, that which is allowed **by the law**. In this regard, our Constitution designates the CJD as an Article V "court of record, with all the attendant duties and powers appropriate to its function." Pa. Const. art. V, § 18(b)(5). As developed later in this Dissenting Opinion, in a common law legal system such as ours, absent other discretion-limiting mechanisms, a court of record is bound by stare decisis. Decisions not tethered to that principle are ipso facto not lawful.

Although this Court has previously equated "lawful" with "available," we have never explained our rationale for excluding any other basis for finding a sanction unlawful. *See, e.g., In re Merlo*, 58 A.3d 1, 15 (Pa. 2012) (observing that Article V, Section 18 "sets forth removal as an available sanction for bringing disrepute upon the judicial office"); *In re Berkhimer*, 930 A.2d 1255, 1260 (Pa. 2007) (indicating that removal was a lawful sanction because the Constitution "sets forth removal as an available sanction for bringing disrepute upon the judicial office"). The Majority offers no further insight into the basis for this constitutional interpretation. As a result, this Court's "interpretation" of our standard of review of sanctions imposed by the CJD is unsupported by important language in the provisions of our Constitution and reasoned analysis.[3]

---

[3] Ironically, while disavowing the importance of precedent as to the CJD's decision-making process, the Majority follows the precedent of this Court to conclude that "lawful" does not encompass stare decisis, a most basic precept of the common law.

Moreover, according to the Majority's interpretation, our standard of review amounts to nothing more than a cross-reference to confirm that the sanction imposed is one mentioned in Article V, Section 18(b)(5). Therefore, it follows that if the CJD imposes a sanction of "removal from office, suspension, [or] censure,"[4] jurists in this Commonwealth effectively have no right of judicial appeal, even though our Constitution guarantees them this right. *See* Pa. Const. art. V, § 18(c)(1) (providing that "a justice, judge or justice of the peace shall have the right to appeal a final adverse order of discipline of the [CJD]"); *see also id.*, § 9 (setting forth "a right of appeal from a court of record … to a court of record or to an appellate court"). Remarkably, the Majority eviscerates, without an analytical or textual basis, the vertical nature of judicial review, since under the Majority's construct, this Court, the highest court in Pennsylvania, has no ability to meaningfully review a decision of an inferior tribunal, the CJD, despite a constitutional grant of appeal thereto. All of this is accomplished by the Majority without any attempt to discern the intent of the voters who adopted the constitutional amendment being interpreted.

It is clear that the primary reason for the amendment, especially in the eyes of the voters, was to separate the investigatory and adjudicatory functions within the

_____

[4] As stated, Article V, Section 18 also permits the CJD to impose "other discipline as authorized by this section … .," Pa. Const. art. V., § 18(b)(5), a phrase not directly implicated here since Roca was removed from office. However, in *In re Melograne,* 812 A.2d 1164 (Pa. 2002), a jurist challenged, inter alia, the CJD's authority to disbar him from the practice of law. Without specific reference to our standard of review of sanctions, we determined that the CJD did not have such authority, because Article V, Section 10(c) of the Pennsylvania Constitution confers exclusive authority upon this Court to discipline attorneys. *Id.* at 1169. Accordingly, *Melograne* makes clear that the CJD's authority is inherently constrained by jurisprudential considerations beyond the confines of Article V, Section 18.

disciplinary system, not to insulate this Court entirely from the process of judicial discipline. In fact, the plain language text of the proposed amendment provided to the voters in May 1993 included nothing about this Court's standard of review of sanctions and nothing to suggest that this Court should be shielded from intervention in the judicial disciplinary system generally. *See* Pittsburgh Post-Gazette, Ballot Questions, 1993 WLNR 2119966 (May 16, 1993).[5]

What is also clear is that Article V, Section 18 grew out of the work and recommendations of the Governor's Judicial Reform Commission, commonly known as the Beck Commission after its chairperson, the Honorable Phyllis Beck. *See* Pennsylvania Court of Judicial Discipline, *A Brief History of the Formation of the Court of Judicial Discipline 1993-1994*, at 2.[6] Governor Robert Casey established the twenty-three member Beck Commission by executive order on July 16, 1987, calling for an extensive re-examination of the judicial system. *Id.* The resulting "Beck Report" made recommendations regarding judicial reform in Pennsylvania. *See id.* (explaining that the Beck Commission recommended that the functions of the judicial inquiry and review

---

[5] The referendum question on judicial discipline read as follows:

> Shall Article V of the Pennsylvania Constitution be amended to establish a Judicial Conduct Board to investigate complaints of judicial misconduct, to establish a Court of Judicial Discipline to adjudicate charges of judicial misconduct, to abolish the Judicial Inquiry and Review Board, and, except as provided by law, to bar payment of compensation, including retirement benefits, to justices, judges, and justices of the peace suspended, removed, or barred from judicial office for serious misconduct?

Pittsburgh Post-Gazette, Ballot Questions, 1993 WLNR 2119966 (May 16, 1993).

[6] This publication is available upon request from the Court of Judicial Discipline.

board be divided between two autonomous bodies); *see also* Report of the Governor's Judicial Reform Commission (January 1988) (recommending the bifurcation of investigatory and adjudicatory processes in judicial discipline, recommending that judges and district justices have a right to appeal a decision of the adjudicatory tribunal to the Supreme Court and indicating that justices of the Supreme Court should not be permitted to judge other justices of the Supreme Court). While it would be fair to assert that the Beck Report, and the constitutional amendment that ultimately evolved therefrom, indicate a desire to insulate Supreme Court justices from discipline by the Supreme Court, nothing can be gleaned from this to support either the Majority's or Justice Todd's definition of "lawful."

We granted oral argument to consider the CJD's obligation to adhere to the doctrine of stare decisis in imposing a sanction in order for the sanction to be "lawful." In light of the Majority's disposition of this case – which, in my view, bestows upon the CJD powers that the people of this Commonwealth never intended for it to have – I begin my discussion by anchoring the doctrine of stare decisis within the broader framework of our legal system. Most nomocratic nations, i.e., nations that adhere to the rule of law, follow one of two major legal traditions that act to cabin the discretion of judges: the civil law system or the common law system.[7] In a civil law system, which

---

[7] A failed alternative, the Court of Star Chamber – a supplement to the common law courts in England during medieval times – was born of the king's sovereign power and privileges, was not bound by the common law and lacked the safeguards that common law procedures typically provided. As a result, it became infamous for its "bizarre and excessive sentences" and was ultimately abolished by an act of Parliament in 1641. Edward P. Cheyney, *The Court of Star Chamber*, 18 Am. Hist. Rev., 729, 742-44 (1913). In the Star Chamber, "every conviction … involved imprisonment for a longer or shorter period according to the will of the court or the pleasure of the sovereign." *Id.* at (…continued)

predominates throughout Western Europe, South America, Asia and Africa, judges are expected to refer to large bodies of codified rules when making decisions on a case. Civil law judges do not create law and their judicial decisions are not considered a source of law for future cases. Prior decisions made by one civil law court are not binding on a subsequent court. Instead, judicial discretion is narrowly circumscribed by statute. *See* Sabrina DeFabritiis, *Lost in Translation: Oral Advocacy in a Land Without Binding Precedent*, 35 Suffolk Transnat'l L. Rev. 301, 312 (2012).

The courts of Pennsylvania, however, like courts in forty-nine[8] of the United States (and elsewhere, including Great Britain, Australia and Canada), are progeny of a common law legal tradition, born in England in the eleventh century. The common law system is characterized by adherence by judges to a body of law established through precedent. Precedent, generally speaking, refers to a prior decision or a consistent group of prior decisions that represents a model to be followed in subsequent decisions. *See id.* at 304, 328 (explaining that the "fundamental preference" of the common law

---

(continued…)

743. When fines were imposed as punishment, "the amount of money … was graduated rather according to the need of impressing the community than in proportion either to the immediate offense or to the ability of the culprit to pay it." *Id.* at 744.

[8] Within the United States, only Louisiana maintains a hybrid legal system with elements of both civil and common law traditions. *See, generally,* Mary Garvey Algero, *The Sources of Law and the Value of Precedent: A Comparative and Empirical Study of A Civil Law State in A Common Law Nation*, 65 La. L. Rev. 775, 792 (2005); *see also In re Orso*, 283 F.3d 686, 695 (5th Cir. 2002) (recognizing that Louisiana stands alone among the fifty states in treating court decisions as secondary sources of law without stare decisis precedential effect).

involves judges applying "the decisions of their predecessors, adapting these to novel cases through reasoning by analogy").[9]

Adherence to stare decisis is a hallmark of our common law system. *Estate of Grossman*, 406 A.2d 726, 731 (Pa. 1979) (discussing stare decisis as "the essence of common law courts today as in earlier times"). The doctrine "declares that, for the sake of certainty a conclusion reached in one case should be applied to those which follow, if the facts are substantially the same." *Commonwealth v. Mitchell*, 902 A.2d 430, 473 (Pa. 2006) (citing *Burtt's Estate,* 44 A.2d 670, 677 (Pa. 1945)); *see also Buckwalter v. Borough of Phoenixville*, 985 A.2d 728, 730 (Pa. 2009) (stating that "Pennsylvania follows the doctrine of stare decisis, which promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process") (internal quotations omitted).

Pursuant to the doctrine, precedential decisions of this Court are binding throughout the Commonwealth, "and the precedential decisions of the lower courts bind those courts as well." *Ario v. Reliance Ins. Co.*, 980 A.2d 588, 599 (2009) (Castille, J., concurring); *see also Yudacufski v. Com., Dep't of Transp.*, 454 A.2d 923, 926–27 (Pa. 1982) (holding that the trial court abused its discretion in failing to follow the established precedent set forth in another court of common pleas decision, since "[i]t is well-settled that, absent the most compelling circumstances, a judge should follow the decision of a

---

[9] Of course, judges in a common law system are often constrained in their decision-making by statutes as well. In many areas of law, the General Assembly's enactments provide an additional discretion-limiting layer. As discussed infra, the criminal sentencing context is one such area.

colleague on the same court when based on the same set of facts"); *Commonwealth v. Beck*, 78 A.3d 656, 659 (Pa. Super. 2013) (acknowledging that a three-judge panel of the Superior Court "is not empowered to overrule another panel of the Superior Court" where the facts of the two cases are indistinguishable); *State Farm Mutual Automobile Insurance Company v. Department of Insurance,* 720 A.2d 1071, 1073 (Pa. Commw. 1998) (recognizing that stare decisis binds the Commonwealth Court to follow its own decisions "until they are either overruled or compelling reasons persuade us otherwise"), *aff'd*, 747 A.2d 355 (Pa. 2000).

Stare decisis, however, is not "an iron mold into which every utterance by a Court, regardless of circumstances, parties, economic barometer and sociological climate, must be poured, and, where, like wet concrete, it must acquire an unyielding rigidity which nothing later can change." *Ayala v. Philadelphia Bd. of Pub. Ed.*, 305 A.2d 877, 887–88 (Pa. 1973), *superseded by statute on other grounds*, Tort Claims Act, 42 Pa.C.S. §§ 8541-8542. Rather, the doctrine demands "thorough examination and deep thought" with respect to prior judicial decisions. *Id.* (quoting former Chief Justice Von Moschzisker, *Stare Decisis in Courts of Last Resort*, 37 Harv. L. Rev. 409, 414 (1924)). Thus, a court bound by stare decisis may determine that prior decisions should not be followed as controlling precedent, but it may not do so without first paying proper deference to those decisions. *Id.* If a court decides to depart from its precedent, it should provide its reasons for doing so.[10] *Id.*

---

[10] A judge may intentionally object to established case law in an effort to engage in a re-evaluation of precedent, perhaps because the precedent has become irrelevant or antiquated in the contemporary climate. According to the Majority, however, the CJD is apparently empowered to reject established case law in every matter it decides, and the (…continued)

While the CJD was established to play a unique role within our common law judicial system, it is indisputably situated within that system. It was created within Article V, The Judiciary, of the Pennsylvania Constitution. Pursuant to Article V, jurists (other than Supreme Court justices) are guaranteed an appeal to this Court, the highest court in the judicial branch of government. *See* Majority Op. at 11 (citing Pa. Const. art. V, § 18(c)(1)). If, as the Majority suggests, the citizens of Pennsylvania had intended to create a court whose decisions need not defer to precedent – a court unlike any other in our Unified Judicial System[11] and shunning centuries of our common law tradition – they would have had to expressly indicate their desire to do so. Yet nothing in Article V, Section 18, expressly or otherwise, remotely suggests that the people of this Commonwealth sought to create a court of unelected judges unconstrained by any check on its discretion to remove elected judges from office. Given its place within our common law system, the CJD is inherently bound to consider stare decisis to at least the same degree as is every other Article V court. Accordingly, the CJD must follow its

---

(continued…)
CJD need not even explain how the circumstances have changed from one time period to another. The CJD has now existed for twenty-four years -- a little more than two decades -- not centuries. To the extent the CJD may legitimately rely on a changing contemporary climate, it should be capable of explaining the change without much difficulty.

[11] There is no question that the CJD's placement in Article V of our Constitution indicates its establishment as a court like all others "within the Unified Judicial System over which this Court presides." *See In re Bruno*, 101 A.3d at 696 (Saylor, C.J., concurring). Our Constitution could have been amended in a different fashion to establish the CJD. Judges on the CJD are appointed in equal number by the Supreme Court and the Governor. *See* Pa. Const. art. V, § 18(b)(1). Had the CJD been envisioned as separate and apart from our judicial system and its common law tradition, unconstrained by the inherent discretion-limiting doctrine of stare decisis, Article IV of our Constitution, which pertains to the Executive branch, could have been amended to accommodate this new body.

own precedent in fashioning and imposing sanctions, and we must review the sanctions it imposes in the same light. In my view, this Court's proper, constitutional standard of review empowers us to vacate a CJD sanction as not "lawful" if, in imposing it, the CJD failed to adhere to stare decisis. In short, lawfulness requires the CJD to engage in a thorough examination of its prior cases. *See* Pa. Const. art. V, § 18(c)(2). Stare decisis does not require rigid application of prior cases and outcomes, but it does require the announcement of the rationale for diverging from them.

The Majority attempts to diminish the importance of stare decisis in the CJD sanctioning context by reference to our criminal sentencing regime where, the Majority suggests, judges have broad discretion to impose individualized punishment. *See* Majority Op. at 23-24 (suggesting that the Eighth Amendment to the United States Constitution is the only limitation on such broad discretion). The Majority's line of reasoning obfuscates an important distinction between criminal sentencing and CJD sanctioning. In the context of criminal sentencing, a sentencing judge's discretion is significantly constrained in a variety of ways, and the Eighth Amendment is by no means the only safeguard against judges handing down capricious punishments. Notably, the sentence a judge may impose in a criminal case is expressly circumscribed by statute. For each class of crime, the Sentencing Code sets forth a maximum term of imprisonment or, in the case of financial penalties, the maximum dollar amount a defendant may be fined. The court is not permitted to impose a sentence or fine that exceeds this statutory maximum under any circumstances. *See, e.g., Commonwealth v. Bradley*, 834 A.2d 1127, 1131 (Pa. 2003) (explaining that sentences exceeding statutory maximum are illegal). In addition to the statutory maximums, judges imposing

criminal sentences must also consider the general standards set forth in the Sentencing Code. *See* 42 Pa.C.S. § 9721(b). Specifically, the sentencing court is required to fashion a sentence that is "consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." *Id.*

Moreover, pursuant to the Sentencing Code, a judge must consider the sentencing guidelines promulgated by the Pennsylvania Commission on Sentencing. In *Commonwealth v. Walls*, 926 A.2d 957 (Pa. 2007), we explained that "consultation of the guidelines will assist in avoiding excessive sentences and further the goal of the guidelines, viz, increased uniformity, certainty, and fairness in sentencing." *Id.* at 964. The guidelines "bring greater rationality and consistency to sentences," "eliminate unwarranted disparity in sentencing," and "serve the laudatory role of aiding and enhancing the judicial exercise of judgment regarding case-specific sentencing." *Id.* at 962, 964. Thus, while the sentencing guidelines are advisory in nature, they "must be respected and considered." *Id.* at 965. When a sentencing court imposes a sentence outside of the recommended guidelines range, it must set forth its reasons for the deviation in a written statement. *Id.* at 962-63. A sentencing court's failure to justify its departure from the guidelines is grounds for resentencing. *Id.*

None of the foregoing statutory limitations exist with respect to CJD sanctions. In my view, this fact renders adherence to stare decisis by the CJD imperative because, as demonstrated by the instant matter, no other mechanism exists to curb that court's discretion in sanctioning in any way. Stare decisis alone stands between the CJD's

intended status as a fair and rationale Article V court of record, on the one hand, and a tribunal in the ilk of a discredited star chamber, on the other. *See supra*, n.7.

Contrary to the Majority's implication, Roca is not asking this Court to adopt a strict requirement of proportionality in sanctioning. *See* Majority. Op. at 16-17. Instead, her complaint is that the CJD's published opinion is largely devoid of any analysis of prior cases in which sanctions were imposed and makes no effort to explain its deviation from prior case law or otherwise support the sanction imposed.[12] Specifically, as observed at oral argument, the CJD ordered Roca's permanent removal from the bench without a studied review of twenty-three years' worth of CJD decisions. Roca argues that "there is a need for uniformity in judicial discipline," and that the discipline imposed cannot depend merely on "who is now serving the four year term on the CJD." Roca's Brief at 59, 79. According to Roca, the fact that the term for a judge on the CJD is four years and a judge cannot be reappointed for at least another year heightens the "importance of prior precedent," as "there cannot be a radical change in discipline" every time there is a new court. *Id.* at 60. To prevent this result, precedent must be reviewed and, when appropriate, followed.

---

[12]  The CJD apparently believes it is bound to follow some of its precedent since it considered the ten factors for the imposition of sanctions it announced in *In re Toczydlowski*, 853 A.2d 24 (Pa. Ct. Jud. Disc. 2004). *See In re Roca*, 151 A.3d 739, 741-43 (Pa. Ct. Jud. Disc. 2016). In the instant matter, however, it gave no apparent weight to the factors that weighed in Roca's favor. Moreover, the non-exclusive factors set forth in *Toczydlowski* are derived from a Washington Supreme Court case, *In re Deming*, 736 P.2d 639 (Wash. 1987), wherein that court makes clear that it has de novo review over sanctions recommended by the judicial qualifications commission. De novo review by the Washington Supreme Court entails a hearing after which the highest appellate court of the state makes its own determination of the law and facts. *Id.* at 642.

Roca directs this Court's attention to numerous prior CJD cases imposing sanctions less severe than permanent removal from the bench, while credibly characterizing the misconduct in those cases as either more extreme or analogous to the circumstances in this case. *See id.* at 63-79.[13] Roca contends that her conduct is no more culpable, and in some respects less culpable, than that of the judges in these cases, and that, conversely, her sanction of permanent removal from office is far more severe than the sanctions imposed in any of these cases. *Id.* To the extent Roca's comparisons may be viewed as overly broad, it bears noting that at least three of the cases Roca cites involve a jurist who improperly rendered assistance (to himself, herself or another) in a judicial matter. *See, e.g., In re Dwight Shaner*, 142 A.3d 1051 (Pa. Ct. Jud. Disc. 2016) (senior magisterial district judge's dismissal of a complaint against a nephew of a former assistant district attorney resulted in sanction of reprimand and

---

[13] *See, e.g., In re Singletary*, 967 A.2d 1094 (Pa. Ct. Jud. Disc. 2009) (magisterial district court judge's statement that motorcycle gang contributors would benefit if he was judge resulted in private reprimand); *In re Willis Berry*, 979 A.2d 991 (Pa. Ct. Jud. Disc. 2009) (common pleas court judge's use of his judicial office and secretary to run his private real estate business resulted in four month suspension); *In re Hamilton*, 932 A.2d 1030 (Pa. Ct. Jud. Disc. 2007) (drunken magisterial district court judge who physically assaulted the police chief at a public golf outing suspended for nine months with one year of probation); *In re Wade Brown*, 907 A.2d 684 (Pa. Ct. Jud. Disc. 2006) (private reprimand for magisterial district court judge who made improper sexual comments to his staff and litigants over lengthy time period); *In re McCarthy*, 828 A.2d 25 (Pa. Ct. Jud. Disc. 2003) (magisterial district judge's consumption of alcohol when he was supposed to be performing his judicial duties resulted in six-month suspension); *In re DeLeon*, 967 A.2d 460 (Pa. Ct. Jud. Disc. 2009) (municipal court judge's use of his office to benefit a friend resulted in three-month suspension); *In re Smith*, 687 A.2d 1229 (Pa. Ct. Jud. Disc. 1996) (private reprimand for common pleas court judge who neglected to decide sixty-one cases over a three year period); *In re Daghir*, 657 A.3d 1032 (Pa. Ct. Jud. Disc. 1995) (common pleas court judge's acceptance of football tickets from a litigant in divorce matter resulted in seven-day suspension); *see also In re Larsen*, 616 A.2d 529 (Pa. 1992) (ex parte communication with common pleas court judge resulted in private reprimand).

censure, and an order that he henceforth shall not be eligible to accept any assignments as a senior magisterial district judge); *In re Kelly Ballentine*, 86 A.3d 958 (Pa. Ct. Jud. Disc. 2013) (magisterial district court judge's dismissal of three of her own traffic court citations resulted in fifteen month suspension without pay, nineteen months of probation and a $18,296 fine); *In re Arnold*, 51 A.3d 931 (Pa. Ct. Jud. Disc. 2012) (magisterial district judge's withholding of her son's citation and failure to be forthright prejudiced administration of justice and resulted in one month suspension without pay).

Given the similarities to the case at bar, the CJD, in keeping with the discretion-limiting doctrine of stare decisis, should be expected, at the very least, to consider its decisions in these three cases when rendering its sanction decision as to Roca. The facial similarities in the facts of these cases suggest that outcomes should be similar. Since they are not, the sanctioned jurists, the rest of the judiciary and the public should know why. Such required analytical reporting by the CJD is the only restraint on its discretion. Otherwise, if it so chooses, the CJD can punish foes and reward friends with impunity.

The Majority expresses a degree of sympathy for Roca's position, but posits that "it is difficult to draw equivalence among distinct cases of judicial misconduct, as the factors involved in each instance will naturally vary." Majority Op. at 18. This statement is true, but entirely irrelevant to the question of the application of stare decisis. It is axiomatic that no two cases are perfectly identical, but the other courts of this Commonwealth, including this Court, do not as a result abandon all efforts to follow stare decisis. That it may be challenging for the CJD to analyze, analogize or

distinguish one case by reference to prior cases does not relieve that court from its inherent obligation to do so.[14]

Having exempted the CJD from the doctrine of stare decisis, the Majority nevertheless posits that the "warranted-by-the-record prerequisite" of Article V, Section 18(b)(5) provides a safeguard against "an unreasonably harsh penalty completely out of proportion to the misconduct involved." Majority Op. at 21. In addition to the patent inconsistency with the Majority's holding that sanctions need not be proportional, in my

---

[14] Notably, the Majority cites to cases from our sister state courts for the proposition that "past judicial misconduct cases … are of limited usefulness," *In re Crawford*, 629 N.W.2d 1, 11 (Wis. 2001), and "proportionality review based on discipline imposed in other cases … is neither required nor determinative," *Broadman v. Comm'n on Judicial Performance*, 959 P.2d 715, 734 (Cal. 1998). *See* Majority Op. at 19. The cases relied on by the Majority are inapposite because the systems for judicial discipline in these states differ in important respects. In Wisconsin, the state Supreme Court imposes discipline upon judges on a de novo basis, although the recommendation of that state's judicial commission panel is entitled to deference. *In re Crawford*, 629 N.W.2d at 10. Similarly, the California Supreme Court has the power to increase or decrease a sanction after independently reviewing a disciplinary matter. The highest court makes its own findings of fact and decides as a question of law whether a sanction is warranted. *Broadman*, 959 P.2d at 734-35 (affirming a sanction of public censure after explaining that "a level of discipline may be warranted either by the existence of a pattern of misconduct or by the seriousness of a single incident").

Moreover, in *In re Crawford*, the Wisconsin Supreme Court noted that while "each case is different, and is considered on the basis of its own facts[,] [t]his individualized approach to discipline … is guided by some general principles." *In re Crawford*, 629 N.W.2d at 10. Citing precedent, that Court characterized suspension and removal from office as "drastic measures, generally reserved for very serious or repeated violations of the Code. Factors considered in establishing the length of a suspension, either in aggravation or in mitigation, have included a history of prior judicial misconduct, and the presence of a remorseful and cooperative attitude." *Id*. In significant contrast, the CJD has not developed any cogent standard against which the misconduct of Pennsylvania jurists may be evaluated and judged, or any set of authoritative factors on which the public and Pennsylvania jurists could know and understand that appropriate sanctions will be imposed.

view, and as evidenced by the instant matter, this is no safeguard at all. Here, the CJD noted,

> It cannot be reasonably disputed that Judge Roca, at first, only requested advice from former Judge Waters, but then the conversation clearly fell into an agreement to obtain ex parte contacts with the judge handling her son's case. However, rather than refuse to participate in this scheme, she fully complied and willfully participated in the scheme.

*In re Roca*, 151 A.3d 739, 743 (Pa. Ct. Jud. Disc. 2016). Concluding that Roca, therefore, had acted "in derogation of the judicial canons" and had engaged in "willful misconduct" – findings that are common in almost every disciplinary case at the sanctions stage – the CJD ordered Roca's permanent removal from office.

The record in this case makes clear that Roca did not "fix" or control the outcome of any case, and that her misconduct was limited to assisting her son in his efforts to open a default judgment to obtain a hearing on his tax case (in which she had no other involvement). *Id.* at 62. The city's case against him was not dismissed; in fact, he paid a negotiated tax settlement of $477.00. Majority Op. at 4 (citing Stipulation, ¶¶ 30-39). Moreover, Roca expressed a deeply felt remorse regarding her involvement in the process. As Roca urges, numerous individuals testified as to her excellent character, her "workhorse" ethic, her respect for everyone in the courtroom, and her lack of any prior allegations or incidents of misconduct. Roca's Brief at 63-64.

Nonetheless, the Majority concludes, "it was not unreasonable for the CJD to conclude that Appellant's removal from the bench was an appropriate sanction in light of all of the facts of the case." Majority Op. at 22. Here, three jurists connected by circumstance – a convicted felon, a repeat case fixer and a one-time violator for the

benefit of her son – were all removed from office.[15] I am unable to discern how the "warranted by the record" prerequisite safeguards against "an unreasonably harsh penalty completely out of proportion to the misconduct involved." *See id.* at 21. As discussed *supra,* absent any of the constraints on discretion imposed by stare decisis, and as evidenced by the circumstances of this case, the CJD is free to determine that **any** set of facts that amounts to sanctionable misconduct warrants the most extreme disciplinary consequence: removal from office of an elected official.

In connection with its "warranted by the record" analysis, the Majority posits that the United States Constitution requires only "inherent-proportionality" review in noncapital criminal sentencing decisions, pursuant to the Eighth Amendment's prohibition on cruel and unusual punishment, but does not, absent "gross disproportionality," require comparison to other sentences. *Id.* at 23 (citing federal

---

[15] It would appear that Roca's removal sanction resulted, in large part, from guilt by association with former Philadelphia Municipal Court Judge Joseph C. Waters ("Waters") and former Municipal Court Judge Dawn Segal ("Segal"), who themselves were involved in a far broader range of judicial misconduct. As noted by the Majority, Waters resigned from office and pled guilty to federal corruption charges as a result of an FBI investigation into his misconduct. Separately, the CJD removed Segal from office. Majority Op. at 1 n.2. In contrast to Roca's isolated ex parte communication with Waters regarding her son's tax case, Segal was found to have "engaged in repeated ex parte communications with Waters about three cases, *Houdini v. Donegal, City of Philadelphia v. Rexach*, and *Commonwealth v. Khoury*. With regard to the *Khoury* case, the record demonstrates that [Segal] made repeated improper ex parte contacts, and later gave assurances to Waters that she would do his bidding, i.e., that these communications were used by the Respondent in her deliberations about these cases." *In re Segal*, 151 A.3d 734, 735 (Pa. Ct. Jud. Disc. 2016). Yet, when setting forth Roca's sanction, the CJD failed entirely to acknowledge that her misconduct, while culpable, was different in degree and kind than Segal's. Instead, the CJD employed identical language in drawing its disciplinary conclusions regarding both Roca and Segal: "As we have said in more detail in prior decisions, when it comes to corrupt acts and the derogation of a fair and just judicial process, a judge must have 'the willingness to stand up for what [is] right and buck a corrupt tide.'" *See id.* at 739; *see also In re Roca*, 151 A.3d at 743.

cases and one Ohio state court case). Arguing for a similarly limited standard of review as to CJD sanctions, the Majority characterizes the CJD's "warranted by the record" requirement as that tribunal's equivalent to an Eighth Amendment "inherent proportionality" requirement, concluding that we may review for gross disproportionality between the judicial misconduct and the sanction imposed, but need not grapple with precedent in doing so. *Id.* at 23 n.15; *see also id.* at 18 n.13.

The previously discussed distinctions between our statutorily prescribed criminal sentencing regime and the judicial sanctioning regime set forth in Article V, Section 18 render the Majority's Eighth Amendment analogy entirely inapposite. As an initial matter, when evaluating proportionality challenges to noncapital sentences pursuant to the Eighth Amendment, we employ the three-factor test set forth in *Solem v. Helm,* 463 U.S. 277, 290-92 (1983) (providing that the court must inquire into the "the gravity of the offense and the harshness of the penalty"; "the sentences imposed on other criminals in the same jurisdiction"; and "the sentences imposed for commission of the same crime in other jurisdictions"). The threshold inquiry asks whether a comparison between "the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Ewing v California*, 538 U.S. 11, 30 (2003). If no such inference arises, it is unnecessary to conduct a comparative analysis of sentences imposed on other criminals or in other jurisdictions. *See id.*; *see also Commonwealth v. Baker*, 78 A.3d 1044, 1053 (Pa. 2013) (determining that "we need not reach the second and third prongs of the test for proportionality review under the Eighth Amendment" where "a threshold comparison of the gravity of a second conviction of possessing and viewing

child pornography against the imposition of a mandatory sentence of at least 25 years' imprisonment does not lead to an inference of gross disproportionality").

As the Third Circuit has aptly observed, the "narrow proportionality" test set forth in *Solem* is premised upon a principle of substantial deference "to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." *United States v. Rosenberg*, 806 F.2d 1169, 1175 (3d Cir. 1986) (quoting *Solem,* 463 U.S. at 290). It is this principle that "restrains us from an extended analysis of proportionality save in rare cases." *Id.* (citing *Solem*, 463 U.S. at 290 n.16); *see also Commonwealth v. Eisenberg*, 98 A.3d 1268, 1283 (Pa. 2014) (recognizing, before conducting a *Solem* analysis, that "acts passed by the General Assembly are strongly presumed to be constitutional" and "that the legislature has the exclusive power to pronounce which acts are crimes, to define crimes, and to fix the punishment for all crimes") (internal citations and quotations omitted).

In matters of judicial discipline, however, the CJD is not constrained by any principle of deference to the legislature because, as discussed *supra*, no statutes exist to regulate judicial sanctions. Accordingly, the premise underlying narrow proportionality review in the Eighth Amendment context is inapplicable as to our review of CJD sanctions. Stare decisis necessarily fills the gap as a curb to limit unbounded discretion in imposing sanctions.[16]

---

[16] Roca has not raised an Eighth Amendment challenge and the Majority, although adopting the rubric of such a challenge, does not embrace following the three-part test for gross disproportionality. If it had done so, pursuant to *Solem*, and absent the ability to compare legislative determinations as to the gravity of distinct forms of misconduct, proportionality review of CJD sanctions under the Eighth Amendment would necessarily require comparison to CJD precedent.
(…continued)

Our treatment of attorney misconduct cases reflects a similar principle.  In the absence of statutory limitations with regard to sanctioning attorneys, this Court employs stare decisis in every attorney discipline case to determine appropriate levels of discipline.  As we have explained, "[t]he final discipline imposed [on an attorney] is determined on a case-by-case basis on the totality of facts presented.  Nevertheless, despite the fact-intensive nature of the endeavor, **we strive for consistency so that similar misconduct is not punished in radically different ways**." *Office of Disciplinary Counsel v. Cappuccio*, 48 A.3d 1231, 1238 (Pa. 2012) (internal citations and quotations omitted) (emphasis added).

In *Cappuccio*, for example, we grappled with whether to impose a sanction of disbarment (which is "properly reserved for the most egregious matters") as opposed to "the next most serious sanction, a five-year suspension."  *Id.* at 1239.  Noting the significance of attorney Cappuccio's position as a public official at the time he committed the misconduct in question, we conducted a lengthy analysis of his case by

---

(continued…)

The Majority's commentary regarding comparative proportionality review for Eighth Amendment purposes in the context of death penalty cases further highlights that discretion must be cabined.  While Eighth Amendment comparative proportionality review is not constitutionally required, many states introduced it by statute "in an effort to limit jury discretion and avoid arbitrary and inconsistent results" following the United States Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972) (determining that previous capital sentencing statutes were unconstitutional because they vested "unguided sentencing discretion in juries and trial judges").  *See Pulley v. Harris*, 465 U.S. 37, 44 (1984).  In *Pulley*, the high Court confirmed that statutes not requiring comparative proportionality review may nonetheless satisfy the concerns expressed in *Furman* if they are "carefully drafted … [to] ensure[] that the sentencing authority be given adequate information … and standards to guide its use of that information."  *Id.* at 46 (quoting *Gregg v. Georgia*, 428 U.S. 153, 194 (1976)).  The bottom line for Eighth Amendment purposes is that a sentencing authority's discretion must be circumscribed in some meaningful way.

reference to our disciplinary decisions in more than five prior cases, comparing and contrasting the nature of the respondent's misconduct to the misconduct in those past matters. *See id.* at 1239-41. Ultimately, we honed in on our decision in *Office of Disciplinary Counsel v. Christie*, 639 A.2d 782 (Pa. 2004), concluding that, despite the similarities between Cappuccio's misconduct and the facts in *Christie*, the former should be disbarred:

> [Attorney Cappuccio] is similarly situated to attorney Christie in terms of the nature of his misconduct, his lack of disciplinary history and prior criminal record, his cooperation, character testimony, expressions of remorse, and efforts at rehabilitation. However, there are two critical distinctions supporting disbarment. First, [Cappuccio] did not present expert testimony meeting the *Braun* standard, and therefore, is not entitled to the type of consideration that was given to attorney Christie; given that Christie received the most severe sanction short of disbarment, the distinction is significant. Second, as discussed, [Cappuccio]'s position as a Chief Deputy District Attorney aggravates the misconduct, particularly in light of the facts here. At the time [Cappuccio] was engaging in his ongoing criminal conduct by endangering the welfare of minors and corrupting the morals, his public persona was that of a law enforcement figure in the county, prosecuting members of the public for similar crimes. In our view, any sanction short of disbarment in these circumstances threatens the integrity of the legal system, undermines our very serious duty to protect the public, and fails to give appropriate weight to [Cappuccio]'s status as a public official. Accordingly, given these two distinctions, which indicate that a more severe sanction than that imposed in *Christie* is warranted in this case, we conclude that disbarment is the appropriate sanction.

*Id.* at 1240–41.

The foregoing is an example of the sort of loyalty to stare decisis I would require the CJD to demonstrate when determining how to sanction jurists. There is no constitutional basis for a discrepancy and it makes no sense that attorneys in this Commonwealth are entitled to the degree of fairness and predictability that flows from

adherence to precedent, while our elected judges are, as the Majority holds, stripped entirely of that right.

Again, what is "lawful" is that which is allowed by the law and there are myriad sources of the law. As one example, the Majority's breathtakingly narrow definition of our standard of review is patently violative of the United States Constitution. For example, if an available sanction were challenged as violative of the Equal Protection clause of the United States Constitution, *see* U.S. Const. amend. XIV, § 1, or on due process grounds, *see id.*, we would be obligated to review that challenge despite the availability of the sanction. *See Driscoll v. Corbett*, 69 A.3d 197, 209 (Pa. 2013) (explaining that state constitutions cannot eliminate rights otherwise guaranteed under the United States Constitution). It is anathema to notions of due process and basic fairness that this Court's standard of review would prohibit us from examining the constitutionality of a CJD decision merely because the sanction imposed falls into a category listed in subsection 18(b)(5). The Majority apparently agrees with me that it is beyond obvious that a lawful sanction requires that it comport with the United States Constitution, *see* Majority Op. at 17 n.11, but it fails to recognize that the definition of "lawful" must therefore be considerably broader than the one it embraces here, or that its definition of "lawful" necessarily precludes the kind of review for constitutionality I discuss herein.

The Majority's reliance on the absence of an express constitutional mandate to follow stare decisis in Article V, Section 18, *see id.* at 17, is meaningless. As noted, the CJD's obligation to adhere to stare decisis is inherent in its designation as an Article V court of record in Pennsylvania, where all courts of record, including this one, apply

stare decisis as a matter of course. No special language is necessary to understand that the CJD must follow its own precedent. Notably, there is no express constitutional mandate for this Court or any other in the unified judicial system to follow stare decisis, but we do so regularly and without exception. Article V, Section 18 also does not mandate that the CJD follow the United States Constitution, but the Majority agrees that it must. *See* Majority Op. at 17 n.11. Nor does Article V, Section 18 mandate that the CJD is limited by other provisions of the Pennsylvania Constitution, but we know that it is. *See supra* n.4 (discussing *In re Melograne*, 812 A.2d 1164, 1169 (Pa. 2002)). Like these concepts, adherence to the doctrine of stare decisis is so fundamental to our understanding of the function of courts that inclusion is automatic in the creation of a common law court.

While purporting to uphold "our judicial system … as the symbol of fairness and justice, and of equal protection dispensed to every citizen," *In re Roca*, 151 A.3d at 741, the CJD's decision to remove Roca from her elected office, without even a nod to the substantial body of countervailing precedent, compromises these very values. The facial lack of consistency in the imposition of sanctions demonstrated by the prior CJD cases chronicled by Roca in her brief, *see supra*, pp. 15-16, does grave damage to any notion that the CJD itself is a symbol of fairness and justice dispensed to every citizen, as judges too are citizens of this Commonwealth. Absent fidelity to stare decisis, the CJD may arbitrarily sanction a jurist and, without the availability of meaningful appellate review, this Court has no ability to reverse it. At a minimum, it must be this Court's function, when reviewing a CJD sanctions ruling, to confirm that in reaching its decision, the lower court has engaged in a lawful judicial process which by necessity involves the

application of stare decisis. In the instant matter, the CJD removed an elected judicial official from office. It imposed this sanction without any meaningful discussion of prior precedent. As such, the sanction imposed in this case is ipso facto unlawful. I would vacate the order imposing sanctions and remand for an opinion in which the CJD thoroughly examines its precedent before imposing a sanction in this case (and would require the same in every case it adjudicates). Accordingly, I dissent.